IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 01-cv-02199-MSK-MEH

MICHAEL E. CLAWSON, and
JARED L. DILLON,

      Plaintiffs,

v.

MOUNTAIN COAL COMPANY, L.L.C.,
ARCH WESTERN RESOURCES, L.L.C. a Delaware corporation, and
ARCH COAL, INC., a Delaware corporation,

      Defendants.

---

## OPINION AND ORDER GRANTING, IN PART, DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW

---

**THIS MATTER** comes before the Court pursuant to the Defendants' oral motion[1] for judgment as a matter of law, made during trial, and the Plaintiffs' oral response; the Plaintiffs' Motion for Assessment and Award of Punitive Damages or for Additur **(#418)**, the Defendants' response **(#434)**, and the Plaintiffs' reply **(#438)**; the Plaintiffs' Motion for Entry of Judgment **(#419)**, the Defendants' response **(#433)**, and the Plaintiffs' reply **(#439)**; Plaintiff Jared Dillon's Motion for Award of Front Pay **(#421)**, the Defendants' response **(#431)**, and Plaintiff Dillon's reply **(#437)**; the Plaintiffs' Motion for Back Pay and Interest **(#422)**,[2] the Defendants' response

---

[1]Subsequent to the trial, the parties filed briefs **(# 420, 432)** in further support of the motion.

[2]Shortly after filing this motion, the Plaintiffs filed a "Notice of Error" and Motion to Amend **(#425)** the original motion to correct a miscalculation of accumulated interest.

(**#436**), and the Plaintiffs' reply (**#442**); and the Defendants' Motion for Application of Statutory Damage Cap and for Reduction of Advisory Back Pay Awards (**#423**), the Plaintiffs' response (**#435**), and the Defendants' reply (**#441**).[3]

**FACTS**

**A.  Generally**

Because the motions at issue concern relatively circumscribed issues arising from the evidence received at trial, a detailed recounting of this case's extensive procedural history is unnecessary.

 In summary, the facts are as follows.   Plaintiffs are former employees of Defendant Mountain Coal Co.'s West Elk Mine.  During 1999 and 2000, both Plaintiffs suffered on-the-job injuries, and were given certain work restrictions by their doctors.  Eventually, both Plaintiffs reached a condition of maximum medical improvement, but remained subject to some work restrictions.  At the time of the Plaintiffs' injuries, Mountain Coal maintained a policy of refusing to permit employees to return to work in any capacity at the West Elk Mine if the employee was

---

Thereafter, the Plaintiffs filed three additional Motions to Amend (**#426, 428, 429**) the original motion.  It is difficult to discern the precise status of the various motions to amend from the various docket entries regarding them.  To simplify the matter, the Court will deny the intervening motions to amend (**#425, 426, 428**) as moot, and grant the last motion to amend (**#429**) insofar as the Court will deem the original motion (**#422**) to be supplemented by the revised interest calculations.

[3]Also pending are the Plaintiffs' unopposed Motion to Speak to Former Jurors (**#415**), and the Plaintiffs' Motion to Clarify and Conditional Motion for Briefing and Briefing Schedule (**#416**), the Defendants' response (**#417**), and the Plaintiffs' reply (**#424**).  The former motion is granted, and the latter is denied as moot.

subject to any medical restrictions.[4]  As a result, neither Plaintiff was permitted to return to work, and both were placed on short-term disability.  After 26 weeks, when their short-term disability benefits were exhausted and they remained subject to medical restrictions, both Plaintiffs were terminated.

The Plaintiffs commenced this action asserting a variety of causes of action.  In April 2006, the case proceeded to a jury trial on three claims: (i) a claim by Plaintiff Clawson that the Defendants violated the Americans With Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), by failing to reasonably accommodate his disability; (ii) a similar failure to accommodate claim by Plaintiff Dillon; and (iii) a claim by Plaintiff Dillon that his discharge constituted discrimination on the basis of disability in violation of the ADA.  At the close of the Plaintiffs' case, the Defendants moved for judgment as a matter of law under Fed. R. Civ. P. 50(a), primarily that the Plaintiffs' evidence failed to establish that either Plaintiff suffered from a "disability" as that term is defined in 42 U.S.C. § 12102(2).  The Court reserved ruling on this issue, and the Defendants put on their case.  At the conclusion of the evidence, with the Court continuing to reserve ruling on the Rule 50 motion, the jury returned a verdict **(#407)** in favor of both Plaintiffs on all counts, awarding Plaintiff Clawson economic damages of $236,000 and non-economic damages of $250,000, and awarding Plaintiff Dillon economic damages of $108,000 and non-economic damages of $250,000.  Although the jury found that the factual predicate necessary for an award of punitive damages, it awarded no punitive damages to either Plaintiff.

---

[4]This proposition was hotly contested at trial.  The Court will address it in more detail *infra.*

3

### B. The instant motions

The parties then filed the instant motions.  The Defendants renewed their oral Rule 50 motion with a written brief **(#420)**, and the Plaintiffs responded **(#432)**.  This motion will be discussed in more detail *infra*.

The Plaintiffs filed a Motion for Assessment and Award of Punitive Damages or for Additur **(#418)**, arguing that the jury's refusal to award any punitive damages was "inadequate and against the great weight of the evidence."  Arguing that the Seventh Amendment to the United States Constitution does not prevent the Court from substituting its own judgment for that of the jury on the amount of punitive damages to be awarded, the Plaintiffs request a punitive damages award from the Court of $200,000 per Plaintiff.  In the alternative, the Plaintiffs request that the Court engage in additur – that is, to grant the Plaintiffs a new trial unless the Defendants agree to an punitive damage award of $200,000.

The Plaintiff also moved for entry of judgment **(#418)**.  This motion contains no legal argument and simply requests that Court enter judgment consistent with the Plaintiffs' other motions.

Plaintiff Dillon moved for an award of front pay **(#421)** in lieu of reinstatement.  He argues that his termination from subsequent employment warrants reducing, not eliminating, any front pay to which he might be entitled.  He requests an award of $58,039 in front pay, reflecting a disparity between his income had he remained employed at the West Elk mine and the income he would have earned through 2012, had he remained employed as his subsequent job.

Both Plaintiffs move separately for an award of back pay and interest **(#422)**.  Acknowledging that the jury's verdict on economic damages was advisory, the Plaintiffs argue

that the jury's verdict was correct and should be adopted by the Court.  The Plaintiffs note that

the jury's award of $236,000 in economic damages to Plaintiff Clawson exceeded the Plaintiffs'

expert's opinion that Plaintiff Clawson suffered $235,431 in economic losses, but contend that the

jury could have deemed the expert's opinions too conservative or awarded additional costs for

miscellaneous expenses incurred by Plaintiff Clawson.  The Plaintiffs also noted that the jury's

award of $108,000 to Plaintiff Dillon was less than the Plaintiffs' expert's opinion that Plaintiff

Dillon suffered more than $146,000 in economic losses, but acknowledge that the evidence

supports the lower amount.  The Plaintiffs argue that any backpay award should not be reduced

by unemployment or Worker's Compensation payments they may have received, in part because

such benefits are not properly deducted from wage awards in employment discrimination cases,

and partly because the Plaintiffs' backpay calculations began only after they ceased receiving

wage-based benefits under Worker's Compensation.  In addition, they argue that the Court should

not reduce a backpay award by the amount of short-term or long-term disability benefits they may

have received. The Plaintiffs further request pre-judgment interest on both economic and non-

economic awards at an interest rate of 8%.

The Defendants filed a Motion for Application of Statutory Damage Cap and for

Reduction of Advisory Backpay Awards (**#421**), arguing that: (i) the Plaintiffs' non-economic

damages are capped at $200,000 by operation of 42 U.S.C. § 1981a(b); (ii) the Court should

refuse to adopt the jury's advisory backpay award to the extent it is based on the Plaintiffs'

expert's opinions because such opinions were premised upon incorrect assumptions or used

incorrect and shifting methodologies[5]; (iii) that Plaintiff Clawson's economic award should be reduced by the value of short-term and long-term disability benefits he received, as well as by amounts he received as unemployment benefits; (iv) that prejudgment interest should not be awarded on any non-economic damages; and (v) that the appropriate prejudgment interest rate is 4.9%, compounded annually.

## ANALYSIS

### A.  Rule 50 motion

At the close of the Plaintiffs' case, the Defendants moved for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a) on three grounds: (i) that the Plaintiffs had not come forward with sufficient evidence to establish that the Defendants regarded them as having a disability under the ADA; (ii) that the Plaintiffs had failed to adduce adequate evidence to support their assertion that all three Defendant corporations should be treated as a single employer; and (iii) that the Plaintiffs failed to establish that some of the open positions they claimed to be qualified to fill were, in fact, actually available at the relevant time.[6]

---

[5]Portions of the Defendants arguments on this point are supported by various affidavits and other documents that were not presented as evidence at trial.  The Defendants argue (without citation to authority) that the Court has the discretion to consider this evidence when deciding whether to adopt the jury's advisory verdict on damages.  The Court finds that considering additional evidence the Defendants chose not to present to the jury would negate any benefits of having the jury render an advisory verdict on damages.  Rather than conduct a *de novo* determination of damages on an expanded record, the Court finds it more appropriate to assess the reasonableness of the jury's advisory award on the same record that the jury had, and thus declines to receive any additional evidence for the purpose of determining an appropriate backpay award.

[6]The Court will not extensively address the last two grounds of the Defendants' motion herein.  With regard to the single employer issue, the Court notes that the Defendants chose not to even address the issue in their written brief.  In any event, the Court finds that there was sufficient evidence of integration among the Defendant entities to permit the jury to find that they

1. Standard of Review

A motion made under Fed. R. Civ. P. 50 is adjudicated under the same standards applicable to motions for summary judgment under Fed. R. Civ. P. 56. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000). The Court must view all of the evidence in the record,[7] and draw all reasonable inferences in favor of the non-moving party – the Plaintiffs. *Id.* However, the Court may not make credibility determinations or weigh the evidence, as doing so would intrude upon the jury's role. *Id.* at 150-51. If the evidence is not sufficient for a reasonable jury to find for the Plaintiffs, the Defendants are entitled to judgment as a matter of law.

---

operated as a single employer. With regard to the failure to prove that certain positions were open, this is not a matter upon which the Court can enter judgment on any of the Plaintiffs' claims, and thus, the motion is denied in that respect.

[7]Ordinarily, the Court would consider the evidence in the record as it existed at the time it reserved ruling on the motion; *i.e.* it would evaluate the Defendants' motion in light of the record as it existed at the close of the Plaintiffs' case. The Plaintiffs argue that, by putting on evidence in their own case after Court reserved ruling on the oral motion made at the close of the Plaintiffs' case, the Defendants have waived any evidentiary defects in the Plaintiffs' case in chief that were subsequently addressed during the defense case. In support of this proposition, they cite *Peterson v. Hager*, 724 F.2d 851, 854 (10th Cir. 1984). In *Peterson*, the 10th Circuit incorporated a quotation form Wright & Miller's Federal Practice and Procedure that "Technically, a party waives his right to a directed verdict, if [the] motion is made at the close of his opponent's case, and thereafter he introduces evidence in his own behalf." *Id.*, *citing* 9 Wright & Miller, Federal Practice and Procedure (Civil) § 2534. "[T]he moving party," the 10th Circuit explained, "had the choice of either standing on his original [Rule 50(a) motion at the close of the plaintiff's case] or proceeding with his case. Because Hager proceeded with his case and supplied the very evidence essential to proof of Peterson's damages, he waived any error in the denial of his initial motion." *Id.*

The Court need not address whether *Peterson* actually requires consideration of the entire trial record, as the Court has reviewed the evidence presented in the Defendants' case in chief and the Plaintiffs' rebuttal case, and finds that the additional evidence presented therein did not materially modify the record as it existed at the close of the Plaintiffs' case, particularly when that record is viewed in the light most favorable to the Plaintiffs.

2. <u>Evidence</u>

Neither party has submitted a trial transcript in support or opposition to the Rule 50 motion, opting instead to proceed based upon their own recollections of the evidence that was received. For purposes of this ruling, the Court has endeavored to reconstruct the trial record by referencing its own notes and the unedited, real-time transcript created by the Court Reporter. It should come as no surprise that the parties' recollection and characterization of the evidence differs, sometimes starkly, from the evidence in the record. Where there was conflicting testimony on an issue, the Court has construed the evidence in the light most favorable to the Plaintiffs.

Plaintiff Clawson, then working as an Underground Production Miner, suffered a back injury in or about October 1998. For a period of time, he continued working on a light-duty assignment, primarily performing fuel hauling tasks. In January 1999, the Defendants abolished light-duty assignments, but Plaintiff Clawson's assignment was exempted from this policy change. In May 1999, the Defendants changed the policy again, this time eliminating all light-duty assignments, including Plaintiff Clawson's. At or about the same time, Plaintiff Clawson's doctor certified that he had reached maximum medical improvement, but he was still restricted[8] from driving a vehicle without shock absorbers over rough roads. Several members of the Defendants' management met with Plaintiff Clawson to discuss his restrictions. According to Plaintiff Clawson, Human Resources Manager Ed Langrand told him that there were no positions available

---

[8]There was some dispute at trial as to whether the advisement by Plaintiff Clawson's doctor was an actual restriction upon the work Plaintiff Clawson was allowed to do, or whether it was merely a recommendation that he refrain from doing so whenever possible. The precise characterization of the nature of this advisement is not material to the outcome of the motion.

8

to him at the mine so long as he had that restriction.  Plaintiff Clawson was then advised to apply for short-term disability benefits.

In July 1999, Plaintiff Clawson returned to his doctor for clarification of his restrictions. He was accompanied by Safety Manager Allen (Bill) Olsen.  Plaintiff Clawson's doctor instructed that Plaintiff Clawson continue to avoid activities that aggravated his injury.  At the conclusion of this meeting, Olsen made a comment to the effect that Plaintiff Clawson probably would not be returning to the mining industry.  However, it is undisputed that, during the same meeting, Olsen consulted with Plaintiff Clawson's doctor about whether Plaintiff Clawson could perform a job in the warehouse that was currently open.  Being advised by the doctor that Plaintiff Clawson would be able to perform the job as Olsen described it, Olsen instructed the Plaintiff to contact the mine if he wanted to be considered for the warehouse job.

Plaintiff Clawson applied for the warehouse job, and in August 1999, was interviewed by, among others, Harrison (Stanley) Hopper and Mary Stahl.  There evidence was undisputed that neither Hopper or Stahl was aware that Plaintiff Clawson had suffered an injury or was subject to any work restrictions.  Hopper ultimately decided not to give the warehouse job to Plaintiff Clawson, citing his belief that Plaintiff Clawson lacked the required qualifications.  Hopper was not pressed to elaborate, and the record does not indicate what particular qualifications Hopper deemed Plaintiff Clawson to lack.   In February 2000, having exhausted his 26 weeks of short-term disability benefits and being unable to return to his assigned position, Plaintiff Clawson was terminated.

Plaintiff Dillon worked as an Underground Maintenance Mechanic or Lube Man[9] until he suffered a back injury in April 1999.  In or about early May 1999,  he returned to work, primarily assigned to fuel hauling duties, but he continued to experience pain.  Plaintiff Dillon continued to consult doctors, received various work restrictions (and, at times, no restrictions whatsoever), and worked intermittently.  On or about June 2, 1999, Plaintiff Dillon again left work due to ongoing pain, and informed his supervisor that he was refusing to return to work until he was "fixed." Plaintiff Dillon made several additional visits to doctors thereafter, and was repeatedly restricted from returning to work.  Plaintiff Dillon did not contact the Defendants at any of these times, assuming that his doctors had passed along that information.  By November 1999, Plaintiff Dillon's doctor concluded that he had reached maximum medical improvement, but he remained subject to a medical restrictions permitting him to engage in occasional lifting of up to 25 pounds, but no lifting in excess of 50 pounds.  Although Plaintiff Dillon believed that his doctor communicated the nature of his final restrictions to the Defendants, nobody from the Defendants contacted him to discuss his restriction or his prospects for future employment.  Plaintiff Dillon was advised by letter on January 24, 2000 that his employment with the Defendants was terminated due to the expiration of his short-term disability leave and his continuing inability to return to his assigned job.

Both Plaintiffs were terminated pursuant to a policy maintained by the Defendants that provided for termination of employment if three factors were present.  The first two factors – that

---

[9]A large amount of testimony addressed whether, as the Defendants contended, there were only two job titles for underground employees – miner and mechanic – or whether, as the Plaintiffs argued, there were a myriad of additional job titles, including fuel hauler, lube man, "permissibility" (inspections), etc.  Resolving the dispute as to what specific job titles existed is not necessary to address the Defendants' Rule 50 motion.

the employee had exhausted his available short-term disability leave and had been certified by his doctor as having reached a state of maximum medical improvement – were not in dispute.  The third factor, however, was the subject of extensive dispute and competing evidence.  According to the Plaintiffs, an employee was marked for termination if his doctor issued any permanent work restrictions of any kind.  The Plaintiffs' position was supported by at least two written personnel memos issued by the Defendants to employees, articulating a policy that an employee must have "no restrictions" before he would be allowed to return to work.  *See e.g.* Ex. 105 ("No hourly employee will be able to return to work in any capacity until [the Defendants] receive[ ] a return to work slip stating that he/she may return to work with 'no restrictions.").  The Defendants, on the other hand, insisted that the actual practice they followed examined whether an employee's medical restriction affected the employee's ability to perform the essential functions of his assigned job.  The Defendants contended that the memos appearing to describe a blanket "no restrictions" policy were inartfully worded, and that the plain language of the memos did not accurately describe the actual policy that they applied.

Because the Court views the evidence in the light most favorable to the Plaintiffs for purposes of evaluating the Defendants' Rule 50 motion, the Court assumes that the Plaintiffs' characterization of the policy – that the Defendants terminated any employee with permanent work restrictions without engaging in any further analysis – was the policy that was actually applied.

### 3. Governing law

The protections under the ADA are available only to individuals with "disabilit[ies]."  42 U.S.C. § 12112(a), § 12111(8).   Under this statute, an individual is deemed to have a disability if

one of three conditions is met: (i) the individual has a physical or mental impairment that substantially limits one or more major life activities; (ii) the individual has a record of having such an impairment; or (iii) the individual is regarded by the employer as having such an impairment. 42 U.S.C. § 12102(2).  In determining whether an individual is disabled under any of the three definitions in the ADA, the central focus is on the individual's "major life activities."  That term is defined by means of examples, which include "caring for oneself, performing manual tasks, walking, seeing, breathing, learning, and working." *Nielsen v. Moroni Feed Co.*, 162 F.3d 604, 610 n. 11 (10th Cir. 1998), *citing* 29 C.F.R. §1630.2(i).

In responding to the Defendants' motion, the Plaintiffs identified two major life activities that they contended were applicable here – "working" and "traveling."[10]  The Court rejects any assertion that "traveling" itself constitutes a major life activity.  Such a task is subsumed within the larger category of "caring for oneself," *Holt v. Grand Lake Mental Health Center, Inc.*, 443 F.3d 762, 767 (10th Cir. 2006) ("Caring for one's self encompasses normal activities of daily

---

[10]Belatedly, the Plaintiffs asserted a third major life activity – "lifting" – they contended applied to Plaintiff Dillon.  The Court finds that the Plaintiffs waived this argument by not timely raising it during oral argument.  Moreover, the Plaintiffs do not address any argument as to this issue in their brief, further supporting a finding of waiver.  In any event, the Court finds that there was insufficient evidence in the record to support such an assertion.  An individual is "substantially limited" in a life activity if he is prevented from or severely restricted in his ability to perform the activity when compared to the average member of the general public.  *Toyota Motor Mfg. v. Williams*, 534 U.S. 184, 197-98 (2002); 29 C.F.R. § 1630.2(j)(1).  There was no evidence to indicate that the Defendants subjectively considered Plaintiff Dillon's impairment to severely restrict his ability to lift compared to the average member of the public.  *See e.g. Prickett v. Amoco Oil Co.*, 147 F.Supp.2d 1147, 1153-54 (D. Utah 2001) (citing cases for the proposition that more stringent lifting restrictions than those involved here were not *per se* substantially limiting, and proof of the general public's ability to lift was required).  Indeed, at best, the evidence at trial merely established that the Defendants considered his restriction only with regard to his ability to perform the type of lifting required at the mine.  This is insufficient to establish a "regarded as" claim based on the life activity of "lifting."

living; including feeding oneself, driving, grooming, and cleaning home"), and there is no evidence in the record to indicate that the Defendants regarded the Plaintiffs as being substantially limited in their ability to care for themselves.

Thus, the sole focus is on whether the Plaintiffs have come forward with sufficient evidence regarding the major life activity of "working." Claims involving the major life activity of "working" have posed particular challenges for the courts. In *Toyota,* 534 U.S. at 200, the Supreme Court discussed "conceptual difficulties inherent in the argument that working could be a major life activity," and explained that it was "hesitant to hold as much." Nevertheless, the Court in *Toyota* declined to directly address the question, *id.*, and in the absence of a definitive ruling from the Supreme Court, most courts, including the 10th Circuit, have treated "working" as a major life activity under the ADA. *EEOC v. Heartway Corp.*, 466 F.3d 1156, 1162 n. 5 (10th Cir. 2006). To establish that an employee is substantially impaired in the major life activity of "working," the employee must show that he is significant restricted in the ability to perform either a "class of jobs" or a "broad range of jobs in various classes" as compared to the average person having comparable training, skills, and abilities. *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 491 (1998), *citing* 29 C.F.R. § 1630.2(j)(3)(i); *Heartway*, 466 F.3 at 1162. It is not enough for an employee to show that an impairment disqualified him from a particular job or a narrow range of jobs. *Sutton,* 527 U.S. at 493, *citing* 29 C.F.R. § 1630.2(j)(3)(i).

A "class of jobs" is defined as the job from which the employee has been disqualified, and the number and types of jobs utilizing similar knowledge, training, skills, and abilities within that geographical area from which the employee is also disqualified because of his impairment. *Id., citing* 29 C.F.R. § 1630.2(j)(3)(ii)(b). A "broad range of jobs in various classes" is defined as the

job from which the employee has been disqualified because of an impairment, and the number and types of other jobs <u>not</u> utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the employee is also disqualified because of his impairment. *Id.*, 29 C.F.R. § 1630.2(j)(3)(ii)(c). Thus, an employee claiming that an impairment limits his ability to work in either a "class of jobs" or a "broad range of jobs in various classes" must, at a minimum, come forward with evidence of: (i) the knowledge, training, skills, and abilities involved in the job that the employee held; (ii) the types of jobs available in the local geographic area; and (iii) the training, knowledge, skills, and abilities involved in those other jobs. *See Bolton v. Scrivner, Inc.*, 36 F.3d 939, 944 (10th Cir. 1994) ("The evidence does not address Bolton's vocational training, the geographical area to which he has access, or the number and type of jobs demanding similar training from which Bolton would also be disqualified . . . Bolton failed to produce evidence showing a significant restriction in his 'ability to perform either a class of jobs or a broad range of jobs in various classes'") (citations and footnotes omitted); *MacDonald v. Delta Air Lines, Inc.*, 94 F.3d 1437, 1445 (10th Cir. 1996) (emphasizing employee's obligation to prove facts about local labor market).

Adding additional analytical complexity is the fact that, in this case, the Plaintiffs do not claim that they <u>actually</u> have impairments that substantially limit their major life activities, nor do they claim to have a record of having such impairments. Rather, they proceed only under the "regarded as" prong.   42 U.S.C. § 12102(2)(c).

In a "regarded as" claim, the focus is not on the <u>objective</u> effect of the employee's actual or perceived impairment on a major life activity, but instead upon the employer's <u>subjective</u> impressions of the consequences of the employee's actual or perceived impairment. *Heartway*,

466 F.3d at 1162-62, *citing Ross v. Campbell Soup Co.,* 237 F.3d 701, 709 (6th Cir. 2001). Thus, for example, to establish Plaintiff Dillon's contention that the Defendants regarded him as being substantially limited in the major life activity of "lifting," he must show that the Defendants subjectively believed that, compared to the average member of the general public, he was severely restricted in his ability to lift things. To show that the Defendants regarded them as being limited in the life activity of "working," the Plaintiffs must show that the Defendants subjectively believed that their impairments disqualified them from a class or range of jobs. *Id.,* 466 F.3d at 1162 (employee must show that employer "subjectively believed the employee to be significantly restricted as to a class of jobs"). As the court in *Ross* explained, proving a "regarded as" case premised upon the major life activity of "working" is "extraordinarily difficult," as "it is safe to assume employers do not regularly consider the panoply of other jobs their employees could perform" when making decisions about the employee's ability to perform in the employer's workplace. *Id.*, *quoted in Heartway*, 466 F.3d at 1162.

        4. Analysis

The Court will turn first to the "working" issue. In responding to the Defendants' motion, the Plaintiffs pointed to two pieces of evidence that they contend are sufficient to carry their burden of showing that the Defendants regarded them as being impaired in their ability to perform a class or range of jobs: (i) the "no restrictions" policy itself, and (ii) the comment by Olsen that Plaintiff Clawson might not be able to return to the mining industry.

        Viewing the evidence in the light most favorable to the Plaintiffs, the "no restrictions" policy prevented them from returning to their former jobs because they had permanent medical restrictions. Moreover, the record indicates that, at least with regard to Plaintiff Clawson,

Langrand believed that Plaintiff Clawson's medical restriction prevented him from being able to perform any of the jobs at the mine. However, this alone is insufficient to carry the Plaintiffs' burden.  It is not enough to show that the Defendants regarded the Plaintiffs as being unable to perform jobs at the West Elk Mine; the Plaintiffs must also show that the Defendants subjectively believed the Plaintiffs restrictions would restrict their ability to perform jobs utilizing similar training, knowledge, skills, and abilities in the geographical area of Somerset, Colorado. *Heartway*, 466 F.3d at 1164.   Thus, the question becomes whether the Plaintiffs offered sufficient proof that the Defendants subjectively believed that the Plaintiffs' medical restrictions would disqualify them from a substantial number of jobs in the geographical area of Somerset, Colorado that involved similar skills and knowledge to those performed at the West Elk Mine.

Once the issue is properly framed, the absence of proof necessary to carry the Plaintiffs' burden is obvious.  Despite calling a vocational expert, the Plaintiffs put on no evidence of the types of jobs available in and around Somerset, Colorado using the same or similar skills and knowledge as jobs at the West Elk Mine.  The Plaintiffs argue in their brief that they offered sufficient evidence of the existence of other heavy equipment operator-type jobs in the local labor market by virtue of their testimony concerning their subsequent employment.  This testimony does not rise to a level of sufficient specificity to meet the Plaintiffs' burden.  Although the burden of showing the types of jobs found in the local labor market is not intended to be onerous, it is incumbent upon the Plaintiffs to at least show "evidence of general employment demographics and/or of recognized occupational classifications that indicate the approximate number of jobs (e.g. 'few,' 'many,' 'most') from which an individual would be excluded because of an impairment." *Heartway*, 466 F.3d at 1164.  The mere recitation of the handful of jobs that the

16

Plaintiffs subsequently found provides no picture of the general labor market around Somerset, Colorado, much less indicates whether their medical restrictions would exclude them from few, many, or most of those local jobs.[11]  (Of course, once again, the question is not whether the Plaintiffs' restrictions disqualified them from local jobs, but whether the Defendants subjectively believed that their restrictions would have that result.)

At best, the evidence (other than Mr. Olsen's comment, which the Court will discuss *infra.*) only establishes that the Defendants perceived the Plaintiffs as being incapable of performing the jobs available at the West Elk Mine. Arguably, an employee might be able to prove his employer regarded him as being disqualified form a class of jobs merely by showing that the employer regarded him as being unable to perform all of the jobs offered by the employer.  In *Henderson v. Ardco, Inc.*, 247 F.3d 645, 653 (6th Cir. 2001), an employee sustained a back injury and was restricted by her doctor from certain types of bending and lifting.  247 F.3d at 647.  She attempted to return to work with those restrictions, but was told by the employer that she must be cleared of all medical restrictions before she could return.  *Id.*  The Sixth Circuit rejected the same initial argument the Plaintiffs make here – that the "no restrictions" policy was *per se* proof that the employer regarded her as limited in her ability to work at a class of jobs. 247 F.3d at 653. Rather, it explained that "[t]he variability of the impairment-relevant job requirements within the business applying the ["no restrictions"] rule is thus important, because it indicates the breadth of the class the employer perceives when the employer applies the rule." *Id.*  In other words,

---

[11]Moreover, the Plaintiffs bear the burden of relating the characteristics of the jobs found in the local labor market to the performance-restricting consequences of the particular impairment they are regarded as having. *Heartway*, 466 F.3d at 1164-65.  Even if their testimony about their subsequent employment was sufficient to demonstrate the depth of the local labor market, no effort was made to correlate that testimony with the Plaintiffs' medical restrictions.

17

*Henderson* stands for the proposition that, when a "no restrictions" policy is imposed by an employer, the Court still must look to the types of jobs that the policy disqualified the employee from, and the court must still examine whether those jobs fall within the definition of a "class of jobs."  If, for example, the employer had only a set of relatively physically demanding jobs available and its policies prevented an employee from working these jobs, the employer would not necessarily be 'regarding' the plaintiff as disabled, as the lack of variability and type of jobs available goes to the narrowness of the class from which the employer excluded the employer. 247 F.3d at 653 n. 6.

Determining the breadth of the class of jobs available at the West Elk Mine based on the evidence in the record is an awkward proposition.  In many instances, specific mining terminology and equipment were referenced without meaningful explanations as to what, how the job of operating them was performed.[12]  Nor was there any evidence purporting to correlate the types of jobs performed by employees at the West Elk Mine, or the skills required for those jobs, with jobs in the coal mining industry generally.[13]  *See Heartway*, 466 F.3d at 1167, *citing DePaoli v. Abbott*

---

[12]There was testimony, for example, that a "ram car" was an all-purpose vehicle used to move coal from the "continuous miner" (another term that was never elaborated upon) to belts that moved the coal out of the mine, and to perform other functions including watering down mine roads and performing rock dusting.  Nevertheless, evidence of the skills and training necessary to operate a ram car, how one is operated, and other details necessary to permit an evaluation of how the task of operating a ram car compares to other types of jobs is not found in the record.  An FT3 was described as "a low profile like a front end loader" that is articulated in the middle, and is apparently used to haul supplies into the mine.  However, there was no testimony as to whether the skills needed to operate an FT3 were similar to those needed to operate a front end loader, or indeed, what skills one needed to have to operate an FT3.

[13]The Court notes that, on at least two occasions, the Plaintiff sought to elicit testimony as to whether the Defendants' pay classifications and requirements of the warehouse job were typical of the mining industry generally, and that the Court sustained defense objections to these questions on the grounds of relevant.  At no time, however, did the Plaintiffs argue that the

18

*Labs*, 140 F.3d 668, 673 (7th Cir. 1998) ("In order to define a meaningful class of jobs . . .

[c]ommon job groupings within an industry would also be relevant.")  Without such evidence, the

Court is unable to find that the types of jobs the Defendants policy excluded the Plaintiffs from –

*i.e.* all jobs at the West Elk Mine – were sufficiently broad as to constitute, of themselves, a "class

of jobs" under the ADA.  Undoubtedly, a jury might reasonably infer that the West Elk Mine's

jobs fall within a recognized "class of jobs," such as "heavy labor jobs," or, arguably, even

"mining jobs," *see Heartway*, 466 F.3d at 1163 n. 6 (citing EEOC regulations that recognize

"heavy labor jobs," "manual labor jobs," etc., as "classes of jobs" and acknowledging, without

necessarily endorsing, other decisions that recognize "truck driving" as a class of jobs), but this is

only sufficient to establish that the Defendants perceived the Plaintiffs as being unable to perform

some of the jobs within that class.  Without proof that the West Elk Mine's jobs are representative

of "[m]any– if not most– of" the jobs in a recognizable class, *see e.g. Heartway*, 466 F.3d at 1167

& n.12, the Plaintiffs have not offered sufficient evidence that the West Elk Mine jobs alone are

sufficiently diverse to themselves constitute a "class of jobs."

The only other evidence of the Defendants' subjective beliefs as to the Plaintiffs'

limitations on the life activity of "working" is Mr. Olsen's comment to Plaintiff Clawson to the

effect that his restrictions might preclude him from working in the mining industry.  On the

surface, Mr. Olsen's comment might be proof that the Defendants[14] regarded Plaintiff Clawson's

_____

evidence was relevant for purposes of establishing whether the Defendants regarded the Plaintiffs
as being limited in their ability to perform a class of jobs.

[14]Although there is disputed evidence as to who ultimately made the decision to terminate
Plaintiff Clawson's employment, there is some evidence in the record to indicate that Mr. Olsen
was one of the individuals participating in that decision, and thus, his subjective impressions of
Plaintiff Clawson's abilities are relevant.

impairment as excluding him from a class of jobs in the mining industry.  On the other hand, it is undisputed that, within the same time frame as making the comment, Mr. Olsen consulted with Plaintiff Clawson's doctor as to whether Plaintiff Clawson could nevertheless perform the warehouse job at the West Elk Mine, and that Mr. Olsen encouraged Plaintiff Clawson to apply for that job.  It is difficult to reconcile these two apparently contradictory positions, but fortunately, that is the role of the jury, not the Court.  It is sufficient to find that, taking the evidence in the light most favorable to the Plaintiffs, a reasonable jury could find that Mr. Olsen's comment reflected the Defendants' subjective belief that Plaintiff Clawson might be disqualified from most, if not all, jobs in the mining industry.  Assuming, as the Court does *supra.*, that "mining jobs" constitute a "class of jobs," Mr. Olsen's comment is sufficient to show that the Defendants regarded Plaintiff Clawson as being significantly impaired in the major life activity of "working," and thus, eligible for protection under the ADA.

However, it is clear from the record that Mr. Olsen's comment was specifically made with reference to Plaintiff Clawson and his impairment, and thus, it offers no support to Plaintiff Dillon's contention that the Defendants regarded Plaintiff Dillon as disabled.  Accordingly, the Court finds that Plaintiff Dillon has failed to come forward with sufficient evidence to establish that the Defendants regarded him as being substantially limited in the life activity of "working."  The Defendants' Motion for Judgment as a Matter of Law is granted in part, insofar as Plaintiff Dillon failed to come forward with evidence to establish that the Defendants regarded him as being disabled, and denied in part, insofar as Plaintiff Clawson produced sufficient evidence to show that the Defendants regarded him as disabled.

**B. Damages**

The remaining motions address various matters relating to damages.  For convenience purposes, the Court groups these motions into three categories: (i) those seeking an addition to or reduction from the damages awarded by the jury; (ii) those seeking the application of statutory limits to an award of damages; and (iii) interest.  Consistent with its ruling above, the Court will analyze the remaining issues only with respect to Plaintiff Clawson.

### 1.   Addition to or reduction of jury's award

Both sides have filed motions in this category.  Plaintiff Clawson seeks an award of punitive damages **(#418)**, and the Court's adoption of the jury's advisory verdict on Plaintiff Clawson's economic losses **(#422)**.  The Defendants request that the Court refuse to adopt the jury's advisory backpay award, citing defects in Plaintiff Clawson's expert's opinions, and requests reduction of any award based on Plaintiff Clawson's receipt of short- and long-term disability benefits and unemployment benefits **(#423)**.

The Court turns first to Plaintiff Clawson's request for the Court to override the jury's determination that, although the predicate facts existed for awarding them, no punitive damage award should be made.  Although it harbors significant doubt that Plaintiff Clawson's reliance on *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 437 (2001), for the proposition that a jury's award of punitive damages is not a finding of fact for purposes of the Seventh Amendment's right to a jury trial necessarily compels the subsequent conclusion that the Court has the authority to impose an amount of punitive damages <u>greater</u> than those awarded by the jury, the Court accepts that contention solely for purposes of discussion. Nevertheless, the Court finds no reason to set aside the jury's refusal to award any punitive damages.

Regardless of whether the Court examines whether the jury's award was so excessive (in this case, excessive in its parsimony) that it deprived Plaintiff Clawson of due process under the *Gore* factors, *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 574-75 (1996), or whether, as Plaintiff Clawson urges, the Court should simply substitute its own judgment for that of the jury and reconsider the issue of punitive damages *de novo*, the result is the same.  The evidence was undisputed that the Defendants initially exempted Plaintiff Clawson's light-duty assignment from its policy change eliminating such assignments.  The evidence also indicates that the Defendants continued to carry Plaintiff Clawson on the payroll for some period of time after his short-term disability leave was exhausted and he was otherwise subject to termination under the Defendants' policies.  Finally, there was evidence that the Defendants offered to re-hire Plaintiff Clawson in 2003.  These facts, among others, could reasonably have lead the jury to conclude that the Defendants' conduct, while unlawful, was not so reprehensible that additional punishment beyond full recompense to Plaintiff Clawson was necessary.  As a result, the Court declines to overturn the jury's determination that no punitive damages were appropriate.

Next, the Defendants request that the Court decline to adopt the jury's advisory determination that Plaintiff Clawson suffered $236,000 in economic damages.  The jury clearly adopted the conclusion of Plaintiff Clawson's damages expert, Ron Brennan, rather than the testimony of the Defendants' expert, Jerome Darnell.  The Defendants argue that Mr. Brennan's assumptions of the pay rate that Plaintiff Clawson would have earned had he been accommodated by reassignment to a vacant position were incorrect; that Mr. Brennan miscalculated the amount of fringe benefits Plaintiff Clawson had earned during his employment with the Defendants; and that Mr. Brennan relied on incorrect wage data from prior years and failed to account for a fire at

the mine in projecting future wages.  Instead, the Defendants argue that the Court should adopt

Mr. Darnell's conclusions.

The Court does not construe the Defendants to be arguing that the jury's verdict is

unsupported by the evidence – Mr. Brennan's assumptions, methodology, and calculations were

clearly evidence that was submitted to the jury – nor an argument that Mr. Brennan's opinions

should be rejected outright as inadmissible under Fed. R. Evid. 702.[15]  Rather, the Court

understands the Defendants to argue that the Court should not adopt the jury's advisory verdict

simply because the Defendants believe their evidence on the issue of damages was more

persuasive.  To state the issue is to essentially resolve it.  The Court submitted the damages issue

to the jury with the specific purpose that the jury would assess the relative credibility of the

parties' experts and their methods.  The fact that the Court might have reached a different opinion

than did the jury is no reason to reject the jury's conclusion; reasonable minds are entitled to differ

on such things.  Given that the jury's evaluation of the experts' competing opinions was both

contemporaneous and considered, as compared to any weighing of such opinions that this Court

would do in hindsight and on a cold record several months after the fact, the Court is inclined to

---

[15]The Defendants previously moved to exclude Mr. Brennan's testimony under Fed. R. Evid. 702 (**#288**).  The Court conducted three days of evidentiary hearings (**#312, 374, 377**) concerning Brennan's qualifications and methods, at which the Defendants raised a number of objections to both matters.  On October 31, 2005, the Court issued an oral ruling (**#378**), deeming some of Mr. Brennan's opinions admissible over Fed. R. Evid. 702 objections, and others inadmissible.  The Court assumes that only opinions previously deemed as admissible were presented at trial.

defer to the jury's decision.  Accordingly, the Court adopts the jury's advisory verdict that Plaintiff Clawson suffered $236,000[16] in economic damages.

The Defendants also argue that Plaintiff Clawson's economic damages should be reduced by the value of his short- and long-term disability benefits, and any amount of unemployment compensation he received.  The 10th Circuit has never spoken dispositively on what social welfare benefit payments should be offset against an award of backpay in an employment discrimination case, but its decisions clearly indicate that several factors warrant consideration: whether the benefit is funded fully by the employer, or whether the employee contributes; whether granting or denying an offset would result in a windfall to either party; whether the benefit would have been available to the employee if he had continued working; and whether other public interests were involved.  *E.E.O.C. v. Sandia Corp.*, 639 F.2d 600, 625-26 (10th Cir. 1980); *E.E.O.C. v. Wyoming Retirement System*, 771 F.2d 1425, 1431-32 (10th Cir. 1985).

Turning first to Plaintiff Clawson's receipt of $11,180 short-term disability benefits from May to November 1999, it is apparently undisputed that benefits were fully self-funded by the Defendants, with no contribution by Plaintiff Clawson.  There is no dispute that that the benefits are provided voluntarily by the Defendants; that is, that there is no public policy that requires the Defendants to make such benefits available.  It is also clear that the benefits are only made available to an employee who is otherwise unable to work, and thus operate as a substitute for wages.  As such, it would amount to a windfall for Plaintiff Clawson if he were to recover

---

[16]The jury's award exceeded Brennan's calculations by approximately $500.  The Plaintiff contends that the jury may simply have rounded up, or may have elected to award the Plaintiff additional damages for unitemized expenses relating to his job searches.  The Defendants do not specifically object to the jury's decision to slightly exceed Brennan's calculation, and thus, the Court will accept the full amount of the jury's award.

backpay for the period from May to November 1999 (a period Mr. Brennan's damages

calculations included), while simultaneously retaining disability benefits he received as a substitute

for those wages during that period.   Thus, the Court finds that it would be appropriate to deduct

the short-term disability benefits received by Plaintiff Clawson from his economic damage award.

The Defendants also seek an offset of $5,809 in long-term disability benefits received by

Plaintiff Clawson from November 1999 through September 2000.  It is undisputed that such

benefits were paid by an insurer on behalf of the Defendants, and that the premiums for such

insurance were paid by the Defendants, without any contribution from the Plaintiff.  As with

short-term benefits, it is undisputed that the long-term disability benefits are intended to operate

as a replacement for wages the employee otherwise does not receive, and that the benefit is not

compelled by law to be provided.  Failing to deduct this amount from the backpay award would

result in a windfall to Plaintiff Clawson, as it would allow him to effectively recover double wages

for the period of November 1999 through September 2000.[17]  Plaintiff Clawson argues that long-

term disability insurance was a part of his negotiated compensation package, and that offsetting

his benefits would have the effect of negating some of his agreed-upon compensation.  However,

an offset does not negate his bargained-for benefits; it gives them full effect.  *See e.g. Giles v.*

*General Elec. Co.*, 245 F.3d 474, 495 (5th Cir. 2001).  He has received the benefits he was

entitled to when he became unable to work, and compensating him a second time with wages for

---

[17]Arguably, allowing an offset might offer some small windfall to the Defendants, insofar
as the premiums payable to obtain insurance should reflect some discount against the benefits
payable under the policy, but the record does not offer any basis upon which such a windfall (to
the extent it exists) could be determined.

that same period of time would be duplicative. Thus, the Court finds that the Defendants are entitled to an offset of the long-term benefits received by Plaintiff Clawson as well.

The same cannot be said of the $15,409 received by Plaintiff Clawson as unemployment compensation. Unemployment compensation, unlike voluntary insurance provided by the employer, is compelled by law to be provided and exists to further social interests beyond those negotiated between employer and employee. Although an employer makes all payments necessary to provide for such benefits, such mandated benefits inflexibly replace employees' ability to bargain for higher wages in lieu of less protection against unemployment, and thus, it would be inaccurate to suggest that the burden of funding unemployment benefits falls entirely on the employer. Most importantly, cases such as *Sandia* and *Cooper v. Cobe Laboratories, Inc.*, 743 F.Supp. 1422, 1435 (D. Colo.1990), make it clear that the more well-accepted trend in this Circuit is to decline to offset a damage award with unemployment benefits. Accordingly, the Court declines to reduce Plaintiff Clawson's economic damages by the value of unemployment benefits he received.

Based on the foregoing, Plaintiff Clawson's economic damages award of $236,000 is reduced by $11,180 in short-term disability benefits and $5,809 in long-term disability benefits, and the Court awards him $219,011 in total economic damages.

### 2. Statutory caps

The jury awarded Plaintiff Clawson $250,000 in non-economic damages. Although the ADA allows the award of these compensatory damages, such awards are subject to statutory caps based on the size of the employer. 42 U.S.C. § 1981a(b)(3). As relevant here, the statute caps non-economic damage awards at $200,000 for employer with 500 or fewer employees and

$300,000 for employers with more than 500 employees in the 20 weeks prior to the alleged discrimination. *Id.* The Defendants concede that they bear the burden of establishing the number of employees they employed.

The jury found that all three corporate Defendants operated as a single employer. The parties' dispute turns primarily on whether, during the period at issue, the three entities cumulatively employed more or less than 500 employees. That dispute, in turn, revolves around whether Defendant Arch Coal had approximately 164 employees during the relevant time period, as the Defendants contend by affidavits, or whether it had in excess of 230 employees, as an EEO-1 report submitted by Defendant Arch Coal in December 2000 indicates. Plaintiff Clawson argues that the Court should not consider the Defendants' affidavit, as the Defendants never disclosed the affiants as a witnesses and that the affidavits are inadmissible summaries under Fed. R. Evid. 803. The Defendants argue that the Court should not consider the EEO-1 forms, based on a conclusory and somewhat cryptic assertion that the forms are unreliable because "The company is required to file EEO-1's on a location-by-location basis, and employees of more than one company may work at a single location."

The Court simply cannot resolve this factual dispute on the skeletal record presented. Accordingly, an evidentiary hearing is necessary to determine the number of employees at each of the Defendant entities during the relevant time period. A 90-minute evidentiary hearing is set for **Tuesday, March 27, 2007** at **1:30 p.m.** in the Arraj Courthouse in Denver. Each side will be permitted a total of 45 minutes for presentation of their witnesses, cross-examination of their opponent's witnesses, evidentiary objections, and argument. Counsel shall confer in advance of

the hearing and attempt to enter into such stipulations as may be appropriate to streamline the admission of evidence and calling of witnesses.[18]

      3.  <u>Interest</u>

The Defendants essentially concede that an award of pre-judgment interest on the economic damage award is appropriate. Based on the foregoing, Plaintiff Clawson is entitled to an award of economic damages of $219,011. Plaintiff Clawson seeks prejudgment interest on this sum at the Colorado statutory rate of 8%, C.R.S. § 5-12-101, calculated according to the formula in *Reed v. Minetta*, 438 F.3d 1063, 1067 n. 4 (10th Cir. 2006). The Defendants propose a prejudgment interest rate of 4.9%, the average rate of 1-year constant maturity Treasury securities as of April 21, 2006, as provided for by 28 U.S.C. § 1961(a), and compounded annually.

The burden of establishing the appropriate interest rate is on Plaintiff Clawson. *See e.g. Barbour v. Merrill*, 48 F.3d 1270, 1279-80 (D.C. Cir. 1995) (plaintiff seeking front pay award bears burden of proving applicable discount rate). Determining the appropriate prejudgment

---

[18]To dispose of collateral issues raised in the parties' briefing of this issue, the Court denies any request to strike witnesses or permit additional discovery. The parties had ample opportunity to anticipate factual disputes over this issue prior to trial and to conduct appropriate discovery at that time. The Court also declines to consider the number of employees at any entity other than the named Defendant corporations. Plaintiff Clawson had the opportunity to request a jury determination as to the single employer issue, and elected to focus only on the named Defendant corporations. To the extent that Plaintiff Clawson believed that other corporate entities or non-party subsidiaries should also be considered for purposes of the statutory caps, a predicate showing that those entities operated as a single employer for purposes of Plaintiff Clawson was required. *See e.g. Parrish v. Solecito*, 280 F.Supp.2d 145, 156 (S.D.N.Y. 2003) (declining to count employees of parent corporation's other subsidiaries absent proof that they collectively operated as single employer). Plaintiff Clawson had a full and fair opportunity to present any single employer claims to the jury, and by electing to proceed only as against the named Defendants, is deemed to have waived any claim that any other corporate entity should be considered for purposes of determining the appropriate statutory cap.

interest rate and compounding formula falls within the Court's discretion, to be exercised with an eye toward ensuring complete compensation to Plaintiff Clawson. *Reed*, 438 F.3d at 1066. Thus, the appropriate rate of prejudgment interest is that which Plaintiff Clawson could have reasonably expected to receive had he invested the funds reflected in his economic damage award from early 2000, the date of his termination, to April 2006, the date of trial.

Plaintiff Clawson presented no evidence at trial and offers none as to what rate of return he would have obtained on an investment over the pertinent time period. Instead, Plaintiff Clawson argues that the Colorado statutory post-judgment interest rate, 8%, should apply. The Defendants contend that a rate of 4.9%, based upon the April 2006 treasury security rate, is appropriate.

Determining an accurate rate of historical returns is a factual issue, for which Plaintiff Clawson bears the burden of proof. His reference to Colorado's fixed statutory post-judgment interest rate does not satisfy this burden, particularly as that statute artificially sets an interest rate for purposes of convenience, not in an effort to accurately reflect historical rates of return. The Defendants concede that 4.9% is an appropriate prejudgment interest rate, and in the absence of evidence to the contrary, the Court adopts a prejudgment interest rate of 4.9%.[19]

---

[19] Interestingly, the rate of 4.9% would appear to exceed actual returns on investments during the requisite time period. For example, between February 1, 2000 and May 1, 2006, the Dow Jones Industrial Average rose from 11,041 to 11,343, an average overall rate of return of 2.7%. Over that same period, the NASDAQ index fell from 4,051 to 2,304, an average return of -43%. For more conservative investments, federal data, reported on an annualized basis, showing the yields of one-year, constant maturity treasury securities rates reveals that, for the period of 2000 to 2006, the average annual yield was 3.33%, and similar federal data showing average rates for 6-month certificates of deposit during the same period shows an average annual rate of return of 3.4%. *See* www.federalreserve.gov/RELEASES/h15/data.htm.

Plaintiff Clawson argues that interest should accrue on each bi-weekly payment as of the date it was due, and should accrue according to the formula in *Reed*.  The Defendants argue that such a calculation is needlessly complicated and, arithmetically, little different from merely compounding interest annually.  Lacking easy access to the raw data, the Court would normally be inclined, solely for purposes of expediency, to agree with the Defendants.  However, if the data were readily available, as it appears to be from Plaintiff Clawson's submissions, it is preferable to apply the more realistic method described in *Reed*.

The Court declines to calculate the actual amount of prejudgment interest due on the economic damage award in this Order, leaving it to the parties to confer and calculate for themselves the amount of prejudgment interest, applying the methodology in *Reed* and utilizing an annual interest rate of 4.9%.  If the parties are able to agree upon an amount of interest by the time of the March 27, 2007 hearing, the Court will hear argument on the parties' respective calculations and resolve the issue at that hearing.

Plaintiff Clawson also requests prejudgment interest on the non-economic damage award. He acknowledges that there is no authority in this or any other Circuit specifically authorizing such an award.  The Court finds that the notion of prejudgment interest to be incompatible with the concept of non-economic damages, which are designed to make Plaintiff Clawson whole for his emotional distress, embarrassment, etc.  Unlike a hard asset, such as wages that would have been received but for discrimination, one cannot invest one's unhurt feelings in the stock market in order to earn a return.  An award of prejudgment interest on compensatory damages would imply the preposterous notion that one's suffering could, at the time, have been used as an investment vehicle.  Absent persuasive authority specifically recognizing the appropriateness of

such an award, the Court declines to award prejudgment interest on non-economic compensatory damages.

## CONCLUSION

For the foregoing reasons, the Defendants' oral motion for judgment as a matter of law is **GRANTED IN PART**, insofar as the Defendants are entitled to judgment as a matter of law on the claims asserted by Plaintiff Dillon, and **DENIED IN PART**, insofar as Plaintiff Clawson introduced sufficient evidence at trial to support his claim.[20]  The Plaintiffs' unopposed Motion to Speak to Former Jurors **(#415)** is **GRANTED**.  The Plaintiffs' Motion to Clarify and Conditional Motion for Briefing and Briefing Schedule **(#416)** is **DENIED** as moot.  The Plaintiffs' Motion for Assessment and Award of Punitive Damages or for Additur **(#418)** is **DENIED**.  The Plaintiffs' Motion for Entry of Judgment **(#419)** is **DENIED** as premature, as there remain matters to be resolved before judgment can enter.  Plaintiff Jared Dillon's Motion for Award of Front Pay **(#421)** is **DENIED** as moot.  The Plaintiffs' Motion for Back Pay and Interest **(#422)** and the Defendants' Motion for Application of Statutory Damage Cap and for Reduction of Advisory Back Pay Awards **(#423)** are **GRANTED IN PART**, insofar as the Court finds that Plaintiff Clawson is entitled to an award of backpay in the amount of $219,011, plus prejudgment interest at an annual rate of 4.9%, compounded as set forth in this Order, and the Court **RESERVES RULING** on the issue of the application of the statutory cap, pending an

---

[20]The Court finds that, pursuant to Fed. R. Civ. P. 54(b), it is inappropriate to enter judgment against Plaintiff Dillon at this time, as any appeal by Plaintiff Dillon of this Court's Rule 50 ruling might present some of the same issues as any cross-appeal Plaintiff Clawson might file in response to an appeal by the Defendants of the judgment in his favor.  Accordingly, the Court will defer entry of judgment against Plaintiff Dillon until such time as judgment enters in favor of Plaintiff Clawson.

evidentiary hearing, and **DENIED IN PART**, in all other respects.  The Court will conduct an

evidentiary hearing at **1:30 p.m.** on **Tuesday, March 27, 2007**, at the Arraj Federal Courthouse

in Denver, for the purpose of addressing the reserved issue of application of the statutory cap.

The Plaintiffs' Motions to Amend their motions (**#425, 426, 428**) are **DENIED** as moot, and as

the Plaintiffs' Motion to Amend motion (**#429**) is **GRANTED**, insofar as the Court will deem the

original motion (**#422**) to be supplemented by the revised interest calculations.

      Dated this 24th day of January, 2007

                              **BY THE COURT:**

                              _Marcia S. Krieger_____

                              Marcia S. Krieger
                              United States District Judge