IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 01-cv-02199-MSK-MEH

MICHAEL E. CLAWSON,
JARED L. DILLON,
THOMAS E. RICHARDS, and
JOHN R. BARTLETT

      Plaintiffs,

v.

MOUNTAIN COAL COMPANY, L.L.C.,
ARCH WESTERN RESOURCES, L.L.C. a Delaware corporation, and
ARCH COAL, INC., a Delaware corporation,

      Defendants.

---

## OPINION AND ORDER DENYING DEFENDANTS' MOTION FOR NEW TRIAL, AND GRANTING, IN PART, PLAINTIFF'S MOTION FOR ATTORNEY'S FEES, EXPENSES, AND COSTS

---

**THIS MATTER** comes before the Court pursuant to the Defendants' Motion for New

Trial **(# 459)**, the Plaintiff's response **(# 476)**, and the Defendants' reply **(# 485)**; the Plaintiff's

Motion for Attorney's Fees **(# 464)**, the Defendants' response **(# 492)**, and the Plaintiff's reply

**(#513)**; the Plaintiff's Motion to Review Taxation of Costs **(# 477)**, the Defendants' response

**(#504)**, and the Plaintiff's reply **(# 509)**; former Plaintiffs John Bartlett and Thomas Richards'

Motion to Review Taxation of Costs **(# 478)**, the Defendants' response **(# 490)**, and former

Plaintiffs' reply **(# 500)**; and the Plaintiff's Motion to Supplement **(# 482)** his Motion for

Attorney's Fees, and the Defendants' response **(# 492)**.[1]

## **FACTS**

In summary, Plaintiff Clawson ("Clawson") and former Plaintiffs Bartlett, Richards, and

Dillon ("Bartlett," "Richards," "Dillon," or, collectively "Former Plaintiffs") commenced this

action, alleging violations of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12100 *et*

*seq.*, along with various state-law claims, arising out of the termination of their employment by

the Defendants. On March 15, 2005, the Court granted summary judgment to the Defendants on

all claims by Bartlett and Richards, and on certain claims by Clawson and Dillon **(# 287)**. The

remaining claims by Clawson and Dillon proceeded to trial in April 2006. The evidence received

at trial is summarized in the Court's Order of January 24, 2007 **(# 447)**.

On April 21, 2006, the jury returned a verdict **(# 407)** in favor of both Clawson and

Dillon, awarding Clawson $236,000 in economic damages, $250,000 in non-economic damages,

and no punitive damages. The jury's verdict in favor of Dillon awarded $108,000 in economic

damages, $250,000 in non-economic damages, and no punitive damages. The parties filed several

post-verdict motions, and on January 24, 2007, this Court granted **(# 447)** the Defendants'

Motion for Judgment as a Matter of Law against Dillon, but allowed the verdict in favor of

Clawson to stand. On March 28, 2007, the Court entered judgment **(# 457)** in favor of Clawson

in the amount of $540,991.07, reflecting the operation of statutory caps and pre-judgment interest

on the jury's award.

---

[1]To the extent any of these motions have been referred to a Magistrate Judge, that
reference is withdrawn.

Thereafter, the parties filed several additional motions. The Court will address the relief requested and the supporting arguments of each motion in turn.

## ANALYSIS

### A. Defendants' Motion for New Trial

The Defendants seek a new trial **(# 459)** under Fed. R. Civ. P. 59, or, in the alternative, remittitur of the jury's $250,000 award of non-economic damages to Clawson, arguing that the award is excessive and unsupported by evidence in the record. The Defendants argue that cases such as *Wulf v. City of Wichita*, 883 F.2d 842, 874 (10th Cir. 1989), establish that an award of no more than $50,000 is appropriate. Clawson opposes the request, arguing that non-economic damage awards are inherently incapable of objective calculation, and that the Court should defer to the unanimous determination of the jury as to the appropriate award. Clawson also argues that the evidence at trial supports the jury's award and cites several cases in which courts have upheld similar awards.

The parties seeking remittitur – here, the Defendants – bear a "heavy burden" to show that the jury's award was "clearly, decidedly, or overwhelmingly against the weight of the evidence." *Blanke v. Alexander*, 152 F.3d 1224, 1236 (10th Cir. 1998). The jury's verdict should be sustained unless it is "so excessive or inadequate as to shock the judicial conscience and raise an irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial." *Id.*. The Court evaluates these criteria mindful that the valuation of non-economic pain and suffering are not susceptible to proof by set dollar amounts, *id.* at 1237, and that the jury's award can be supported by any competent evidence tending to sustain it. *Guides, Ltd. v. Yarmouth Group Property Management, Inc.*, 295 F.3d 1065, 1076 (10th Cir. 2002).

Turning first to the evidence adduced in support of a non-economic award, Clawson testified on direct examination that he reported a work-related injury to the Defendants in October 1998, that he continued working on a light-duty assignment until the Spring of 1999, at which point he was placed on the Defendants' short-term disability program. Clawson exhausted his available short-term disability benefits in February 2000, at which time, despite his good performance, his employment was terminated pursuant to a company policy that, at least on its face, compelled the termination of any employee subject to ongoing work restrictions. He testified that following his termination, work was "pretty scarce," and he "took whatever work [he] could find." He described this time period as being "pretty stressful from time to time," and the evidence indicates that he was employed by approximately 10 different employers during a period from 2000-2003, when he finally obtained full-time employment at another mine. He also testified that he felt "rejected" by the Defendants.

On cross-examination, Clawson acknowledged that he was not so distressed that he sought help from any mental health provider, nor that it prevented him from finding and performing a variety of other jobs. On redirect examination, he offered some amplification of his testimony concerning the emotional distress he suffered. He explained that being terminated after several years of service felt like "getting my feet kicked out from under me," and that having to continuously look for and take short-term jobs "was a lot of stress and heartache and it just didn't make me feel very good at all." He testified that the termination affected him financially, in that he "had payments at the time when they let me go," forcing him to take whatever work he could find. The final question posed to Clawson was how it felt to have received a positive job

evaluation and thereafter to be terminated, to which the Plaintiff responded that "I guess it didn't make me feel very superior."

There can be little dispute that this evidence is sufficient to permit the jury to award some compensatory damages to Clawson for emotional distress; the question posed by the Defendants is whether that amount awarded is excessive. In assessing whether an award is excessive, the Court considers factors such as the severity of the conduct directed at the plaintiff and the context in which it took place, the nature of the harm suffered by the plaintiff, and other economic and convenience factors. *See e.g. Smith v. Northwest Financial Acceptance, Inc.*, 129 F.3d 1408, 1416-17 (10th Cir. 1997). It is appropriate that such analysis should be "informed by a review of awards granted in comparable cases." *Wulf*, 883 F.2d at 875. Once again, however, the question is not whether the award "seems high" to the Court, nor whether the Court would have made the same award on its own.[2] *Goico v. Boeing Co.*, 358 F.Supp.2d 1028, 1030 (D. Kan. 2005). Rather, to be excessive, the award must "shock the judicial conscience" and "raise an irresistible inference that passion, prejudice, corruption or other improper cause" gave rise to the jury's verdict. *Blanke v. Alexander*, 152 F.3d 1224, 1236 (10th Cir. 1998).

Judged by this exacting standard, the Court cannot conclude that the jury's award of $250,000 in compensatory damages is conscience-shocking, nor that it demonstrates that the jury was motivated by improper purposes in rendering it. It is undoubtedly generous to Clawson, given the relatively benign terms by which he described his suffering. However, it is not so generous that the Court cannot conceive of legitimate justifications that could have motivated the

---

[2]The Defendants have not argued that the jury's compensatory award was merely advisory, nor that the Court is otherwise free to simply discard the jury's verdict and enter its own compensatory award.

jury to determine such sum. First, there is the inherent emotional upset that accompanies being involuntarily terminated from any job, much less termination from a job one has held for several years, and for which one has received positive performance evaluations. The jury could reasonably have concluded that this distress was exacerbated by the fact that Defendants' decision to terminate Clawson was both discriminatory and willfully so. The jury might also have concluded that the distress of being terminated under these circumstances was further magnified by the fact that instead of being able to immediately find similar replacement work in his field, Clawson was only able to locate lower-paying, temporary positions, thereby heightening concerns as to whether he would be able to remain financially solvent. Although the Court might not have found this evidence to warrant an award of $250,000, many citizens might reasonably conclude that the embarrassment of being terminated from a job for unlawful reasons, the stress of financial uncertainty resulting from underemployment spanning several years, and the discomfort that accompanies anticipation of a future of uncertain employment prospects warrants an award in this amount. Finally, the Court is mindful that this award was the unanimous verdict of 11 jurors. Given the size of the jury as compared to smaller jury panels used in many civil cases, the Court perceives a reduced chance that the verdict was the result of inflamed passions of a small number of like-minded jurors.

The parties make substantial efforts to compare the nature of the evidence in this case with other cases under the belief that *Wulf* requires it. However, as the 10th Circuit recently explained in an unpublished decision, "nothing in *Wulf* contradicts the basic principle that a jury's damage award is highly specific to the facts and circumstances of the case." *Evans v. Fogerty*, 241 Fed.

Appx. 542, ___ (10th Cir. Aug. 22, 2007) (unpublished).[3]   Indeed, *Wulf* itself observes that

"comparisons with other cases are not dispositive."  883 F.2d at 875.  Although other cases may

offer some aid in evaluating general trends in what types of damages awards are considered

excessive, the mere fact that another court directed remittitur or a new trial on somewhat similar

facts is not especially persuasive. To find otherwise would be to disregard the unique factual

determination that each jury is called upon to make.  *See generally Smith v. Ingersoll-Rand Co.*,

214 F.3d 1235, 1252 (10th Cir. 2000) ("We are hesitant to accept the invitation to undertake this

comparative inquiry [as] such comparisons yield no insight into the evidence the jurors heard and

saw or how they used it during their deliberations").  *Evans*, a case only months old, observes that

compensatory awards of $150,000 and $300,000 "appear to be at the upper range of emotional

damages upheld in this circuit."  *Id.*, *citing Dodoo v. Seagate Tech., Inc*., 235 F.3d 522, 531 (10th

Cir. 2000) (upholding $125,000 award) *and Smith*, 129 F.3d at 1416 (upholding $200,000

award).  The jury's award in this case falls within that same range, suggesting that this award is

not so extreme as to be conscience-shocking.

       To the extent that the Court compares the facts of other cases,  the Defendants are correct

that *Wulf* is the most similar.  In *Wulf*, the plaintiff was terminated from his employment in

retaliation for his exercise of First Amendment rights.  Following a bench trial, the court awarded

the plaintiff approximately $ 240,000 in back pay and $250,000 in emotional distress damages,

among other things.  After reducing the backpay award to approximately $160,000, the court

turned to the emotional distress award.  It found that the plaintiff had testified that his termination

---

[3]Pursuant to 10th Cir. R. 32.1(a), *Evans* is not cited for its precedential value, but because
it is persuasive in explaining how *Wulf* should be understood to apply in cases such as these.

was "very stressful," and that his wife testified that he was under "tremendous emotional strain" and that they experienced financial difficulties as a result of the employer's actions. 883 F.2d at 875. The 10th Circuit found that this evidence was sufficient to warrant an emotional distress award, but further found that an award in the amount of $250,000 was excessive. *Id.*

However, reference to *Wulf* would be incomplete without employing the methodology used by the court in that case to evaluate the reasonableness of the emotional distress award. There, the 10th Circuit compared the compensatory award with recent rulings from other circuit courts upholding compensatory damage awards in discrimination cases involving similarly limited evidence of emotional distress.[4] Using the same approach, this Court notes *McDonough v. City of Quincy*, 452 F.3d 8, 22 (1st Cir. 2006) *and cases cited therein*, in which the court found an award of $300,000, most of which reflected emotional distress, was not excessive where the plaintiff was "humiliat[ed]" by his termination, felt that his reputation had been damaged, and observed that it caused his relationship with his family to suffer, but resulted in no long-term physical symptoms or need for medical treatment. This Court also notes *Eich v. Board of Regents*, 350 F.3d 752, 763-64 (8th Cir. 2003), in a $200,000 compensatory award was upheld even though the only cited evidence of emotional distress was the plaintiff's testimony that she was "frustrat[ed]" and "devestat[ed]" by the employer's conduct. *See also Knight v. Metropolitan Govt. of Nashville*, 136 Fed.Appx. 755, 62 (6th Cir. 2005) (unpublished) *and cases cited therein* (finding $150,000 emotional distress award not excessive where plaintiff suffered emotional distress, financial hardship, and reduced standard of living after termination). to the

---

[4]The 10th Circuit in *Wulf* did not attempt to draw parallels between the nature or severity of the discrimination at issue in the cases it compared. Thus, this Court does not do so.

extent that *Wulf* found that $50,000 represented the upper limit of typical emotional distress awards in 1989, it is clear that, in the ensuing two decades, modern circuit court rulings have commonly approved of non-economic damage verdicts substantially in excess of that amount, well within the range of the jury's verdict here.

The Defendants argue that the 10th Circuit continues to apply *Wulf*'s $50,000 ceiling on non-economic damages in more recent cases, citing to *Powell v. COBE Laboratories, Inc.*, 2000 WL 235241 (10th Cir. Mar. 2, 2000) (unpublished) and *Praseuth v. Rubbermaid, Inc.*, 406 F.3d 1245, 1253 (10th Cir. 2005). However, both cases are unpersuasive as to the issue pending before this Court. In *Powell*, the 10th Circuit affirmed the trial court's reduction of an emotional distress award in a sex discrimination case from $300,000 to $50,000. The Court of Appeals noted that the trial court had found the evidence at trial to parallel that discussed in *Wulf*, and concluded that the same reduction to $50,000 should be imposed there. *Id.* at * 9. The 10th Circuit merely observed that "[g]iven the facts of this case, the district court did not manifestly abuse its discretion" in doing so. *Id.* Although a superficial reading of *Powell* might suggest that it strengthens the Defendants' position here, a more focused analysis reveals that decision to be inapposite. The scope of the 10th Circuit's review must be kept in mind – the Court of Appeals reviews decisions by this Court to grant remittitur or a new trial under an "abuse of discretion" standard, one which is highly deferential to the findings of the trial court. *See e.g. Hardeman v. City of Albuquerque*, 377 F.3d 1106, 1123 (10th Cir. 2004) (applying "manifest abuse of discretion" standard); *Sheets v. Salt Lake County*, 45 F.3d 1383, 1390 (10th Cir. 1995) (applying "gross abuse of discretion" standard). Thus, the 10th Circuit's finding that a reduction of the compensatory award in *Powell* was not an abuse of the trial court's discretion is not the functional

equivalent of the 10th Circuit finding that such a reduction was <u>required</u> under *Wulf*, such that the trial court would have abused its discretion had it <u>not</u> done so. *Powell* might suggest that this Court could grant the Defendants' motion without erring, but it does not stand for the proposition that this Court would err if it did not do so. Thus, *Powell* does not establish that a reduction of the sort used in *Wulf* is necessary to bring the jury's award into compliance with 10th Circuit law.[5]

*Praseuth* is even more unpersuasive. There, the jury awarded the plaintiff $50,000 in compensatory damages, and the plaintiff appealed, arguing that the jury's award was insufficient in light of the evidence. 406 F.3d at 1253. The 10th Circuit affirmed, finding that there was sufficient evidence to justify the jury's smaller award. *Id.* Because *Praseuth* does not involve any discussion of when a larger compensatory award must be reduced, it is of no relevance in this analysis.

This Court concludes that slavish devotion to *Wulf* is not appropriate, and that the Defendants' request for remittitur should be denied. As discussed above, the persuasiveness of *Wulf* lies in the manner in which the 10th Circuit performed its analysis, not in the bottom-line dollar figure it eventually reached. Casting *Wulf* as a bright-line rule – that emotional distress awards should not exceed $50,000 where testimony merely recites hurt feelings and inconvenience – would severely overstate the scope of the Court of Appeals' ruling in that case. While it may have been true that in 1989, compensatory awards of $50,000 represented the upper limit of what other courts had found acceptable, cases both inside and outside this circuit reveal that that is no longer the case, and reading *Wulf* as establishing some fixed ceiling on

---

[5]The Court is further unpersuaded by the lack of any significant discussion of the 10th Circuit's reasoning on this issue in *Powell*, and by *Powell*'s unpublished status.

compensatory awards would require this Court to ignore almost two decades of development in the law. Moreover, focusing on the <u>outcome</u> of *Wulf* instead of the <u>process</u> by which the 10th Circuit reached that outcome is an invitation to simply compare evidence among cases to determine how much should be awarded. Numerous cases, including *Wulf* and the authority it relies upon, eschew attempts to compare cases in this way. *Wulf*, 883 F.2d at 875, *citing Sykes v. McDowell*, 786 F.2d 1098, 1105 (11th Cir. 1986) ("Comparison of verdicts rendered in different cases is not a satisfactory method for determining excessiveness *vel non* in a particular case and ... each case must be determined on its own facts"); *see also Evans*, *supra*.

Moreover, the Defendants have not pointed to any evidence that would suggest that the jury's non-economic damage award was motivated by "passion, prejudice or another improper cause," *Wulf*, 883 F.2d at 874-75, rather than a dispassionate attempt by the jury to quantify an injury that resists easy valuation. Indeed, in some respects, the absence of exaggerated or histrionic testimony by Clawson as to the extent of his emotional distress suggests that the jury's verdict was not influenced by deliberate appeals to emotion. The jury was instructed that their verdict "should be guided by dispassionate common sense" and that they were not to "award damages based upon sympathy." Having heard the evidence at trial and observed the demeanor of the witnesses and the jurors throughout this trial, the Court finds no reason to assume that the jury disregarded those instructions, and the Defendants certainly do not supply any evidence to the contrary. Although the jury's compensatory award might be considered quite generous to Clawson, the Defendants have not shown that the award was the result of improper influence on the jury, and the Court finds that it is within the range of acceptable awards recognized in modern

caselaw both inside and outside this circuit. Accordingly, the Defendants' Motion for a New Trial or Remittitur is denied.

### B. Plaintiff's Motion for Attorney's Fees and Plaintiff's motions regarding costs

Clawson moves for an award of attorney's fees pursuant to 42 U.S.C. § 12205 and 42 U.S.C. § 1988(b). Those statutes provide that the Court may allow the prevailing party a "reasonable attorney's fee, including litigation expenses and costs." The parties do not dispute that Clawson is a "prevailing party" as to his claim of failure to accommodate under the ADA.

In his initial motion **(# 464)**, Clawson requests a total of $747,710.50 in attorney's fees, representing 3,615.5 hours of attorney time, 30.1 hours of law clerk time, and 1,946.4 hours of paralegal time, and $46,824.98 in litigation expenses. Shortly thereafter, Clawson also sought review **(# 477)** of the Clerk's taxation of costs in his favor. Prior to the Defendants' response to the attorney's fee motion, Clawson moved to supplement **(# 482)** this request to add certain items of costs that had been denied by the Clerk on his Bill of Costs, to correct several arithmetic errors in the original motion, and to add certain additional fees incurred for post-judgment activities. Clawson's motion, as supplemented, requests $757,462.02 in fees and $51,545.60 in expenses.

In response **(# 492)**, the Defendants raise a wide variety of objections to Clawson's request, both with regard to the hours spent on various tasks, and the hourly rate requested for certain individuals. The Defendants contend that an appropriate fee award would be $253,324.20, and that costs and expenses in the amount of $ 28,280.87 should be awarded. In reply **(# 513)**, Clawson concedes certain specific billing entries or rates challenged by the Defendants, and defends others. In light of the concessions, Clawson reduces his demand to $746,253.97 in fees and $49,141.99 in expenses and costs.

1. <u>Standards for awarding attorney's fees</u>

When considering a claim for attorney's fees, the moving party bears the burden of proving his entitlement to an award, as well as the appropriateness of the hours expended and the hourly rate sought. *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983). Once the Plaintiff carries the burden of establishing an appropriate amount of hours spent and a reasonable fee, those numbers are used to generate a "lodestar" amount. *Praseuth*, 406 F.3d at 1257; *Robinson v. City of Edmond*, 160 F.3d 1275, 1280-81 (10th Cir. 1998). The lodestar is a presumptively reasonable fee award, taking into account most of the factors that bear on the reasonableness of the award, and thus, adjustments to the lodestar should only be made in rare and exceptional cases. *Pennsylvania v. Delaware Valley Citizens Council for Clean Air*, 478 U.S. 546, 564-65 (1986).

2. <u>Disputes as to hourly rates</u>

The Defendants challenge the hourly rate claimed for three of the individuals providing services to the Plaintiff. The Court determines a reasonable hourly rate based on the parties' submitted evidence of market data showing rates charged by attorneys of comparable skill and experience in the area. *Case v. Unified School Dist.*, 157 F.3d 1243, 1256 (10th Cir. 1998). Here, the Defendants do not challenge the claimed rates as being inconsistent with prevailing market rates, but rather, challenge Clawson's request reflecting current, rather than historical, billing rates for the three individuals involved.

First, the Defendants challenge the $150 per hour rate claimed for all hours worked by attorney Damon Davis. The Defendants argue that, when this case began in 2001, Davis was a newly-admitted attorney, and that the proper rate for his billings in the earlier years of the case should be reduced to reflect his lack of experience at that time. (More accurately, the Defendants

request that all of Davis' time be assessed at a blended rate, somewhere between his rate as a first-year associate and his current billing rate.)  However, the Supreme Court has recognized that in situations such as these, where the plaintiff's entitlement to attorney's fees must await the conclusion of the case several years after the services are rendered, courts typically offset the delay in payment by either basing the award on current, instead of historical, billing rates, or by adjusting historical fees to account for their present value (*i.e.*, by awarding prejudgment interest on the fee award).[6]  *See Missouri v. Jenkins*, 491 U.S. 274, 282-84 (1989).  Accordingly, the Court finds that all of Davis' hours are properly billed at $150 per hour.

Next, the Defendants challenge the $200 per hour rate claimed by Joanna Jensen, on largely the same grounds as their challenge to Davis' rate.  Jensen was a fifth-year associate when the case began, apparently charging $125 per hour, but during the course of the case, she became a shareholder in Clawson's counsel's firm, and seeks reimbursement for her services at the $200 per hour rate charged by the firm for work by shareholders.  The Defendants request that a

---

[6]An argument could be made that this line of reasoning is inapplicable in this situation.  Arguably, the Supreme Court's reasoning in *Jenkins* – that use of current rates properly reflects lost time value of money on fees billed, but not collected, in earlier years – is appropriate only where rates have increased over time due to inflation.  In other words, an attorney who bills $100 per hour in the initial years of a case, and who later increases his rate to $125 to keep pace with inflation, might be entitled to recover his earlier hours at the $125 rate, as a current payment of $125 per hour is the functional equivalent of the attorney having received $100 per hour at the time the service was rendered, plus the interest that could be earned on that $100 between the date of payment and the present day. However, the same logic might not apply where, as in Davis' case, the increased hourly rate does not simply track inflation, but rather, reflects the attorney's increased experience and ability to handle more complex matters more efficiently.

The Defendants did not clearly raise such an argument in their brief, and thus, the Court need not reach it.  In any event, the Court is aware of no persuasive authority that interprets *Jenkins* in this manner.  Moreover, this concern is easily rectified by awarding only those hours that a lawyer at Davis' <u>current</u> level of experience would have expended on the work he performed at a time when he was less experienced.  The Court's assessment of the number of hours reasonably expended on this case has been made with this issue in mind.

blended rate be used for all of Jensen's hours to account for her lower billing rate earlier in the case. For the reasons stated above with regard to Davis, this request is without merit, and Jensen's work is properly billed at $200 per hour.

Finally, the Defendants challenge the same $200 rate claimed by Beacher Threatt, raising the same arguments as with Jensen and Davis. For the same reasons stated previously, Threatt's $200 rate is proper.

### 3. Disputes as to hours reasonably expended

The Court awards attorney's fees only for those hours that were reasonably expended on the litigation, and the burden is on Clawson to demonstrate that his counsel used "billing judgment" in winnowing down the hours <u>actually</u> spent to those <u>reasonably</u> expended. *Praseuth*, 406 F.3d at 1257. In other words, the Court will not award fees for time spent by counsel that was excessive, redundant, or otherwise unnecessary. *Robinson*, 160 F.3d at 1281. In assessing the reasonableness of claimed hours, the Court considers numerous factors, including, but not limited to, whether the tasks for which compensation is sought are those that would normally be billed to a paying client, the complexity of the case, the number of reasonable strategies pursued, the aggressiveness of the other side, duplication of effort by multiple counsel, and the clarity with which time spent is recorded and allotted to specific tasks. *Id.*, *citing Ramos v. Lamm*, 713 F.2d 546, 553 (10th Cir. 1983), *citing Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974). Ultimately, the Court's goal is to fix a fee that would be equivalent to what the attorney would reasonably be able to bill for those services in an open market. *Id.*

The Defendants raise a number of objections, both general and specific, to the reasonableness of the hours claimed by Clawson. The Court will address the specific complaints first, then move on to the more general objections.

A. Clerical tasks

First, the Defendants object to requests for time spent by paralegals on primarily clerical duties. For example, the Defendants cite various billing entries by paralegal Tonette Southern and Kathi Stahl in which these individuals billed time for arranging delivery or transmission of correspondence, reviewing briefs and incoming documents, and routing invoices within counsel's offices. The Defendants suggest that Southern and Stahl's time be reduced by 50%. In reply, Clawson agrees that some of these entries reflect improper secretarial time, and concedes that $1,673.65 in time should be excluded. However, Clawson contends that clerical duties incident to compensable services performed by the paralegal (*e.g.* drafting correspondence, then ensuring that it is mailed) should be permitted, and, in any event, contends that a 50% reduction in paralegal time overestimates any non-compensable services performed by Southern and Stahl.

The Court disagrees with Clawson that clerical work incidental to work properly performed by a paralegal should be billed. In *Jenkins*, the Supreme Court justified awarding paralegal fees where the work performed by the paralegal is that which "might otherwise be performed by a lawyer and billed at a higher rate." 491 U.S. at 288 n. 10. It contrasted compensable work at that which "lies in a gray area of tasks that might appropriate be performed either by an attorney or paralegal," and non-compensable work, such as "purely clerical or secretarial tasks [which] should not be billed at a paralegal rate, regardless of who performs them." *Id.* Clawson seizes on the word "purely" in this quote, assuming it to mean that clerical

16

duties that are related to compensable work renders the clerical time recoverable as well. However, the Court reads this language to distinguish between work which "lies in a gray area" – that is, work that an attorney lacking paralegal support might reasonably be expected to bill for performing him or herself – and "purely secretarial" duties that an attorney would not expect to be able to bill for, even if the attorney had actually performed the task. *Jenkins* provides for a paralegal's performance of the former to constitute recoverable "attorney's fees," while the latter does not. In this respect, the Court concludes that clerical work performed by a paralegal – or, for that matter, an attorney – incidental to other compensable tasks is nevertheless not subject to a fee award.

However, the Court also finds that the Defendants' suggestion that Stahl and Southern's hours need to be reduced by half to account for their performance of clerical tasks grossly overstates the extent to which such duties appear in their billings. By and large, clerical entries amount to only relatively small percentage of the time billed by Southern and Stahl. The most common category of objectionable time entries by Southern are those that bill for "review[ing] and distribut[ing]" correspondence, pleadings, and other documents from clients, the court, or opposing counsel. Although it may be appropriate for a paralegal to review some incoming documents for the purpose of computing response dates, many of the entries at issue here are not the sort of documents that required a response, much less calculation of a response date. *See e.g.* Docket # 464, Ex. 22a, entry # 2217 ("Review and distribute joint motion to continue pretrial conference"); entry # 2224 ("Review and distribute Order received from the Court regarding acceptance of supplemental authority"); entry # 2328 ("Review and distribute correspondence received from opposing counsel regarding preparation of another Status Report to the Court

regarding expert witness deadlines"); entry # 2774 ("Review and distribute Order received form the Court denying Def's Motion to Compel").[7]  Paralegal time spent "reviewing" incoming documents that do not require the computation of deadlines does not relieve an attorney from the obligation of doing so; rather, paralegal time spent "reviewing" such matters is simply duplicative. Moreover, time spent by a paralegal "distributing" documents around the office is clearly clerical work that is not compensable in any circumstance.

The Court finds it impractical to attempt to locate and excise each and every instance in which Stahl or Southern performed unnecessary document review and distribution, or other non-compensable clerical functions.  Instead, the Court will simply make a percentage reduction from the hours claimed for them.  *Case*, 157 F.3d at 1250.  Based on the Court's assessment of both individuals' time entries, it appears that a wholesale reduction of Stahl and Southern's claimed hours by 10% would sufficient to account for all time charged for their non-compensable clerical duties. According to Docket # 464, Ex. 23, the Plaintiff claims a total of 953.14 hours for Southern and 910.32 hours for Stahl, both at a $50 per hour rate, for a total of 1,863.46 hours, or $93,173.  From that, the Plaintiff's reply brief concedes that an additional $1,673.65 should be reduced from Southern and Stahl's time, leaving a claim for $90,886.31 for their services. Applying the Court's 10% reduction to account for clerical services, Stahl and Southern's billings are reduced to $81,797.68.

---

[7]Stahl's time entries contain similarly non-compensable work of this sort.  *See Docket #* 464, Ex. 13, entry # 3473 ("Reviewing/filing/distributing letter from opposing counsel enclosing CD of photos and EEO-1 reports); entry # 3647 ("Reviewing/filing/distributing letter from opposing counsel regarding 2004 paystubs"); entry # 3662 ("Reviewing/filing/distributing letter from opposing counsel regarding changing location of trial").

The Defendants also challenge the Plaintiff's claim for paralegal services performed by paralegals Hollie Van Roosendaal and Andrea Pearson for the same reasons. Van Roosendaal's time entries consist almost exclusively of entries denoted as "Exhibit Lists for trial (preparing)." *Docket* # 464, Ex. 14. Pearson's billings consist of several entries reading "exhibit notebook" or "exhibit lists; [witness]," and entries such as "sort exhibits," "find order regarding summary judgment," "copy exhibits," and "e-file [several documents]." The Court finds that entries indicating that Van Roosendaal prepared an Exhibit List are sufficient to carry the Plaintiff's burden of showing that such time is compensable. Although "preparing" an exhibit list could encompass both compensable and non-compensable types of work, in the absence of argument or proof to the contrary, the Court will assume that Van Roosendaal's actions fall on the compensable side of the line. However, the Court finds that all of the entries by Pearson are either too vague to permit the Court to conclude that the services she performed were those that would otherwise have been performed by an attorney, or are clearly clerical in nature. Accordingly, the Court will permit all of the hours claimed by Van Roosendaal (a total of $1,440), and exclude all hours claimed by Pearson ($1,611.50).

Finally, the Defendants challenge the remaining time entries by other paralegals as being either too vague to permit analysis or as showing that the time spent was clerical in nature. The Court finds that most, but not all, of the work claimed by Jamie Dumler is clerical in nature, *see e.g. Docket* # 464, Ex. 17 (entries such as "Revise Clawson motion regarding collateral sources" and "T/C to Vogenthaler to revise affidavit" could be considered compensable tasks), and finds that no more than 3 hours, or $150, is compensable for such services. The work performed by Diane Jenkins is a mix of clerical and arguably paralegal work, *see e.g. Docket* # 464, Ex. 18, and

the Court reduces the $1,979.10 claimed for this work by 50% to exclude clerical time, leaving $989.55 as compensable time. The work by Mishcha McCabe, *Docket* # 464, Ex. 19, is entirely clerical in nature and is excluded. The work by Paula Mitchell, *Docket* # 464, Ex. 20, and Colleen DuKett-Cotts, *id*, Ex. 21, appears to have involved some limited paralegal work in the form of determining filing deadlines, and for each individual, the Court awards a total of 1 hour of time at $50 per hour, for a total of $100 for this work.

B.  Unsuccessful motions

The Defendants challenge Clawson's claim for time spent on certain unsuccessful motions. Time spent bringing or responding to motions is not rendered unrecoverable simply because the plaintiff was unsuccessful with regard to the motion; rather, the Court must examine whether the time spent pursuing the motion was "reasonably expended in pursuit of the ultimate result." *See Bruno v. Western Elec. Co.*, 618 F.Supp. 398, 404 (D. Colo. 1985). At the same time, the Court is also mindful of the aggressiveness of the opponent in the litigation; the more tenacious and contentious the defense, the more likely that the costs of vigorously-pursued motion practice will be recoverable. *See e.g. Praseuth*, 403 F.3d at 1260. Noting these concerns, the Defendants contend that they are only challenging time spent on specific motions for which they contend Clawson presented no reasonable, good-faith argument.

The Defendants point to two motions which Clawson not only lost, but for which his counsel was sanctioned: the April 16, 2003 Motion to Compel **(# 137)**, and Clawson's opposition to the Defendants' October 31, 2002 Motion for Costs **(# 57)**. As to the Motion to Compel, Clawson sought production of a variety of documents over the Defendants' discovery objections. The Magistrate Judge ultimately denied **(# 149)** the motion in its entirety, apparently due to

Clawson's failure to set forth the text of each discovery request and response in the body of the motion as required by D.C. Colo. L. Civ. R. 37.1, and additionally sanctioned Clawson's counsel in the amount of $500, reflecting the cost to the Defendant of responding to the motion. Clawson filed a Fed. R. Civ. P. 72(a) objection (**# 158**) to the Magistrate Judge's ruling, and this Court affirmed (**# 245**) the denial of the motion for the reasons given by the Magistrate Judge, but vacated the sanction, finding that the Magistrate Judge did not afford Clawson an opportunity to be heard on the issue of sanctions before they were imposed.

The Court finds that the attorney's fees spent on Clawson's Motion to Compel are not recoverable here because the time spent by Clawson's counsel on that motion was not reasonably related to the ultimate result at trial. The mere fact that Clawson lost the motion, or that sanctions were imposed (and later vacated), is not dispositive. However, the fact that the motion was so procedurally deficient that it was never adjudicated on its merits is. A motion that is denied for a procedural defect is, for all meaningful purposes, no motion at all. It does not result in a resolution of any dispute by the Court, and does nothing to clarify the parties' respective positions on the substantive issue; it does not "advance the ball" in any way for either side. Put differently, after all the time is spent making and resolving the motion, the parties find themselves in no different legal, factual, or rhetorical position than they were before the motion was made. In such circumstances, the Court cannot find that Clawson's Motion to Compel was reasonably related to the ultimate result at trial, and thus, Clawson is not entitled to the fees incurred for making the motion.

The Defendants identify the fees related to this motion to be $10,103.75 (at the rates requested by Clawson and accepted by the Court *supra*). Clawson contends that the motion

presented to the Magistrate Judge was the culmination of a series of conferrals between the parties on a broader motion to compel, and that such conferrals narrowed the issues in dispute. As a result, he contends that the time spent on those fruitful negotiations should not be excluded. Moreover, Clawson contends that because his effort to overturn the Magistrate Judge's ruling was partially successful, he should recover those fees as well. Clawson calculates the fees spent solely on the drafting of the motion that was actually presented to the Magistrate Judge to be $1,869.50. Although there is merit to Clawson's contention that the parties' fruitful negotiations narrowing the scope of the dispute prior to the filing of the motion should be recoverable, the Court rejects any contention that efforts to overturn the Magistrate Judge's ruling should be compensable. Counsel's efforts only succeeded in obtaining relief for <u>counsel</u>, not for the client. In other words, the only benefit secured by Clawson's objections was one that ran to Clawson's counsel personally, not anything having to do with the merits of the litigation. It is unreasonable to expect the Defendants to pay for work that only secured a personal benefit for counsel. Based on the Court's review of Exhibit O to the Defendants' response, the Court calculates the fees expended from March 10, 2003 – the date Clawson's counsel began conferring specifically with regard to the contents of the unsuccessful Motion to Compel – to the conclusion of the issue to be $5,367.50. That amount will be excluded from Clawson's request.

The Defendants also challenge the reasonableness of Clawson's opposition to a 2002 motion for costs relating to Bartlett's failure to appear for a deposition. In reply, Clawson concedes that this time should be excluded, and has excluded that time from the amount requested in his reply brief. Accordingly, the Court need not reach this issue nor make an adjustment in this regard.

Next, the Defendants contend that Clawson made several motions to strike, all of which were both unsuccessful and unnecessary. Specifically, they identify Clawson's November 2002 motion to strike **(# 59)** a responsive brief by the Defendants; a January 2003 motion to strike **(# 77)** a reply brief by the Defendants; and post-withdrawal briefing by Clawson on an April 2003 motion to strike **(# 142)** that Clawson later withdrew **(# 155)**, but thereafter filed a reply **(# 162)** in support of the withdrawn motion. The Court finds that all three matters were unnecessary and unreasonable, and declines to award fees for any of them. With particular regard to the last two matters, Clawson implicitly admits that his counsel got caught up in the mutual contentiousness of the litigation, and that, under *Praseuth*, the Defendants' aggressive litigation strategy is as much to blame for inducing Clawson to file the documents as Clawson's counsel himself. The Court flatly rejects this argument. Just as children are admonished that "he started it!" is not an acceptable excuse for improper behavior, the dictates of professionalism require an attorney to ignore perceived provocations by the adversary where no material purpose would be served by responding. Accordingly, the Court finds that the $5,071.55 identified by the Defendants as relating to these motions should be excluded.

The Defendants next identify a series of motions that it contends are the result of mistake or confusion by Clawson's counsel that should not result in an award. Specifically, the Defendants challenge: multiple motions **(# 425, 426, 428, 429)** made by Clawson to correct miscalculations in his initial request for prejudgment interest; Clawson's motion seeking clarification of a briefing schedule **(# 416)**; Clawson's motion for entry of judgment **(# 419)**; and Clawson's notice of completed briefing **(# 446)**. With regard to the motions correcting calculation errrors, the Court commends efforts by the parties to correct mistakes, but finds that it

is inappropriate to require the Defendant to bear the costs of correcting the Clawson's counsel's miscalculations – miscalculations the Defendants neither caused nor had the ability to prevent. Moreover, the Court has some doubt that a reasonable attorney would ever charge his client for fees expended to correct errors resulting from counsel's own miscalculations. As to the remaining filings, the Court agrees with the Defendants that such filings were unnecessary and, despite Clawson's belief that they helped advance the resolution of the pending matters, finds that such unnecessary filings delay, rather than accelerate, resolution of the issues. Accordingly, the Court will exclude $2,723 in fees identified by the Defendants as related to these filings.

The Defendants move to exclude $6,369.15 in fees expended by Clawson in opposing the Defendants' successful motion seeking dismissal of Clawson's claims for discriminatory termination and retaliation as unexhausted **(# 269)**. This Court granted **(# 280)** the Defendants' motion as to both claims. The grounds for the Defendants' opposition to these fees are not clear – the Defendants either contend that these fees reflect "uselessly expended time on unsuccessful theories" or reflect Clawson's "limited success in the litigation." (Quotation marks omitted.) The Court finds that such fees are excludable in part and compensable in part. Although *Hensley* authorizes a reduction in fees to reflect a litigant's partial success, the Court should not reduce fees simply because Clawson asserted multiple legal theories, some successful and some not, arising out of the same core set of facts. *Praseuth*, 406 F.3d at 1258-59. Rather, the notion of "partial success" on multiple claims warrants exclusion only of time spent on claims that are "distinct in all respects from the successful claims." *Id.* Here, Clawson's claim for discriminatory termination duplicated, in most material respects, his claim for failure to accommodate. Both claims sought damages for the Defendants' refusal to return Clawson to work following his injury,

24

and both arose from essentially the same operative facts. Thus, there is no justification for reducing the fees spent by Clawson in pursuing and defending this claim, even though such pursuit was unsuccessful.[8]

By contrast, a claim for retaliation is entirely distinct from the claim of failure to accommodate. It springs from an entirely different set of facts, and requires proof of a different intent on the part of the Defendants. Thus, *Praseuth* permits the Court to exclude fees spent by Clawson in bringing and defending the retaliation claim. Clawson's billing entries do not clearly differentiate between the time spent researching and developing the arguments supporting each claim. A review of Clawson's response **(# 271)** to the Defendants' motion reveals that very little argument was devoted to addressing the specific claims; rather, the bulk of Clawson's argument involved arguments as to general principles of exhaustion and jurisdiction common to both claims. Thus, little effort would have been saved had Clawson promptly surrendered the retaliation claim when challenged by the Defendants. The Court finds that a reduction of the $6,369.15 figure by 15% is sufficient to exclude fees incurred by Clawson defending the retaliation claim against the Defendants' motion. This results in a reduction of $955.37 from the Plaintiff's requested fees.

The Defendants also seek to exclude time spent by Clawson on motions he unsuccessfully filed, specifically: a motion for punitive damages or additur **(# 418)**, a motion to exclude certain photos and video **(# 294)**, several motions directed at attempting to permit experts to appear at a Rule 702 hearing by affidavit **(# 362, 363, 365)**, and a motion for sanctions **(# 449)**. The

---

[8]To the extent that the Defendants contend that Clawson's argument that the discriminatory termination claim was properly exhausted was so unreasonable as to warrant denial of fees, the Court disagrees. Although the argument was unsuccessful, it was not so devoid of reason as to warrant denial of fees.

Defendants do not specifically point to anything in these motions that was unreasonable or improper, but merely indicate that Clawson was unsuccessful on them. The Court sees nothing particularly unreasonable about the positions taken in any of these motions, and the Court resolved each of these motions on their merits. Although unsuccessful, these motions were reasonably filed in pursuit of the verdict Clawson ultimately obtained, or were reasonably proportional to the same types of motions that the Defendants themselves filed in similar circumstances. Accordingly, the Court makes no deduction from the requested fees for these motions.

Finally, the Defendants seek to exclude fees incurred by Clawson in opposing certain motions on which the Defendants were successful, specifically, Clawson's opposition to the Defendants' motion for trial in Grand Junction **(# 351)**, and his opposition to the Defendants' motion in limine reagarding reinstatement **(# 291)**. The Defendants make only a conclusory assertion that the arguments presented by Clawson in opposition to these motions was "clearly without merit." The Court finds that Clawson presented a colorable justification for opposing a change in the venue of the case for trial, but finds that he has not adequately demonstrated that he had a colorable argument in opposition to the motion regarding reinstatement. In Clawson's reply to the motion for attorney's fees, he states that he opposed the motion in limine regarding reinstatement on the grounds that it was essentially a dispositI've motion on the Defendants' affirmative defense of mitigation, and was filed beyond the deadline for dispositive motions. Clawson makes a naked assertion that he believed he had sufficient evidence to oppose the Defendants' mitigation defense, but ultimately concluded that such evidence would not be persuasive, and thus, he conceded the matter at trial. The Court has examined both the arguments

in Clawson's reply brief and in his opposition to the motion in limine (**# 308**), and concludes that Clawson has not shown that he had a reasonable basis for refusing to concede the defense at the time the Defendants filed the motion in limine. The sole fact cited by Clawson in opposing the motion in limine was his position that the Defendants' offer of re-employment did not include "seniority," thereby entitling him to continue to sue to obtain some sort of speculative "lost seniority benefits." Clawson's inability to point to substantial evidence justifying opposition to the motion in limine warrants denial of fees incurred by him in opposing a motion that should have been promptly conceded. Accordingly, the Court reduces the fee claim by $616.25 to account for time spent opposing the motion in limine.

## C. Trial consultant

The Defendants challenge Clawson's request for $6,747.15 in fees expended by counsel in working with a trial consultant, and an additional claim for $4,850 in expenses, representing fees charged by the consultant. In his initial motion for fees, Clawson's counsel explains that "[w]hen attorneys have been entrenched in a case for a number of years, it is difficult to see the case from the perspective of an outsider, such as a juror." He explains that he retained a consultant to "assist[ ] with trial strategy, particularly jury instructions, opening and closing arguments, witness order, exhibits to be presented, and demonstrative exhibits." He cites to *BD v. DeBuono*, 177 F.Supp.2d 201, 204 (S.D.N.Y 2001), in which the court authorized a fee award for the services of a litigation consultant, comparing the consultant to "the equivalent of additional attorneys or legal paraprofessionals."

The Court finds that recovery of fees and expenses for the trial consultant are inappropriate in this case for at least two reasons. First, the Court finds that Clawson has failed to

adequately set forth the particular services the trial consultant provided. The consultant's bill is included as Exhibit 29 to Clawson's initial fees motion, and most of the entries involve either the consultant "review[ing]" various items or having "conference call[s] with [the] litigation team." None of the entries indicate that the consultant created or revised any of the material used at trial, nor do they indicate that the consultant engaged in any independent research or analysis. At best, the records show that the consultant – whose qualifications are not specified – looked over various materials that counsel had created and had discussions about them. The contents of those discussions are not specified, and the affidavits and reports that accompany Clawson's motion for fees and reply brief do not materially clarify the situation. Simply put, Clawson has failed to adequately set forth the nature of the services provided by the trial consultant, much less demonstrate their utility and reasonableness. Even assuming that this Court followed *DeBuono* and treated the services of the trial consultant as the equivalent of the services provided by another attorney or paralegal, the record does not reflect that the consultant's services did anything other than duplicate work performed by other attorneys for whom Clawson independently seeks fees.

Moreover, the Court has some doubt that, even if Clawson had adequately established that the trial consultant performed specific duties that were not duplicative of work performed by others, such services would nevertheless be compensable. Although Clawson's own attorney's fees expert states that she would always conduct a "focus group" before going to trial, she makes clear that this is not what the trial consultant retained by Clawson did. *See Docket* # 513, Ex.61at 12. Clawson's expert opines that "[t]he use of a trial consultant is analogous to the use of a focus group or mock trial," but it is apparent that the two types of services necessarily differ in some

respect, as Clawson's counsel initially contacted the consultant to "conduct[ ] a mock trial," but later concluded that "the most cost effective use of [the consultant's services] would be as trial consultants." *Id.* The Plaintiff's expert goes on to state that she has never actually employed the services of a trial consultant, and attests only to the utility of conducting a focus group or mock trial. *Id.* Thus, there is no evidence in the record to indicate that the services of a trial consultant – as opposed to the use of focus groups or mock trials – is typically used by attorneys in cases such as these, or indeed, that such services are an item that would normally be billed to a client. Under these circumstances, even if the nature of the services provided by the consultant were more apparent, the Court would likely find that Clawson has failed to establish that those services were compensable.

Accordingly, the Court will reduce Clawson's fee request by the $6,747.15 identified by the Defendants as being time spent by counsel in working with the consultant, and will reduce the expenses claimed by $4,850, the amount billed by the consultant.

### D.  Items related solely to Former Plaintiffs

The Defendants identify a number of billing entries that relate solely to work on claims by Former Plaintiffs Richards, Bartlett, and Dillon.  For example, Clawson seeks fees regarding the Defendants' reopening of discovery to address Dillon's mitigation of damages, and seeks fees for preparing Dillon and his treating physicians to testify.  More generally, the Defendants complain that Clawson has not made adequate adjustment to the total amount of fees expended through trial to account for the Court's dismissal of claims by Dillon.  To a lesser extent, the Defendants also identify billing entries that relate solely to Bartlett and Richards, and raise a general objection

that Clawson has not adequately reduced his request for fees to reflect the Court's dismissal of Bartlett and Richards' unsuccessful claims as well.

Turning first to specific billing entries that the Defendants contend relate solely to the Former Plaintiffs' unsuccessful claims, the Court agrees that some, but not all, of the disputed items should be excluded. For example, the Defendants challenge $4,352.45 in fees claimed by Clawson in preparing Dillon and his doctors, Drs. Fox and Coonrod, to testify at trial. Clawson concedes that preparation of Dillon's doctors is not compensable, and has excluded (in the amount of $1,376) those fees from the total requested in the reply brief. However, he contends that the trial preparation of Dillon would have been required in any event, as Dillon's testimony was also offered in further support of Clawson's claims. There is some merit in this contention, but the Court also notes that, to the extent it was offered simply to support Clawson's claims, much of Dillon's testimony was either unnecessary (*e.g.* to the extent it focused upon his own damages), or cumulative (*e.g.* repetitive of numerous witnesses who testified about practices in the mine, or about the manner in which Defendants' policies were applied). Indeed, the Court observes that many of the other current and former employees of the mine called as witnesses at trial typically testified for half an hour or less, *see e.g. Docket* # 399 (Shawn Pfifer, 22 minutes; Randall Daugherty, 13 minutes), and even the trial testimony by Former Plaintiffs Bartlett and Richards amounted to one hour or less each. *Id.* Thus, it would appear that, at best, Dillon's testimony as a witness in support of Clawson's claim warranted no more than one hour of testimony, and the Court will permit an additional hour of preparation time for that testimony. At $250 per hour for Keith Killian, Clawson's lead trial counsel, and $150 per hour for Davis, the

Court finds that the presentation of Dillon's testimony at trial warrants no more than $800 in fees. The Court reduces the $2,976.45 claimed by the Plaintiff for this item by $2,176.45.

The Defendants also challenge the time requested for the preparation and trial testimony of Ron Brennan and Jerome Darnell, the parties' respective experts on the issue of damages. The Defendants contend that, because each witness testified as to the damages sustained separately by Clawson and Dillon, the amount sought for their testimony should be reduced by half to reflect the unnecessary testimony given regarding Dillon. Clawson argues that the majority of testimony given by both witnesses related to their experience and methodologies, not to the specifics circumstances of himself and Dillon. Clawson contends that, to the extent a reduction is warranted, that reduction should not exceed 25%, although he does not explain the justification for that figure. This Court often views the trial testimony of a expert regarding claims by two separate parties to be divisible roughly into thirds – that is, the general qualifications and methodology of the witness amount to one third of the testimony; and the remaining two-thirds, reflecting the witness' explanation of how the methodology is applied to yield a result in each party's specific factual circumstances, can be equally divided between the parties.[9] Having heard the testimony in this case, the Court finds that this general analysis is applicable here, concludes that the $3,286.35 claimed by Clawson for Brennan and Darnell's trial testimony should be reduced by 1/3, thereby omitting time that would have been spent analyzing damages that were particular only to Dillon. Thus, the Court reduces the amount requested by $1,084.49.

_____

[9]In actuality, the direct examination of an expert often focuses more on the expert's qualifications and methodology, and less on the specific facts presented. However, cross-examination of the expert often focuses more on the expert's consideration of facts that are specific to the parties. On balance, the Court finds that this typically warrants a division of the expert's entire testimony into equal thirds as a useful rule of thumb.

More generally, the Defendants complain that Clawson has failed to make adequate reductions in all fees requested to account for time that was attributable to the pursuit of all of the Former Plaintiffs' claims.[10] The Defendants contend that Clawson's requested fees should be reduced by as least 75%, representing the fact that three of the four original plaintiffs' claims were completely unsuccessful. Clawson responds that he has already eliminated billing entries that are exclusively attributable solely to the Former Plaintiffs, and contends that the remainder of the billing entries reflect time that would nevertheless have been spent developing only his own claim. The Plaintiff's expert concedes that a 5% reduction in the total fees billed would be appropriate to reflect time spent solely pursuing the Former Plaintiffs' claims, although no explanation is offered for why that particular figure was chosen.

As discussed above, *Hensley* contemplates that the Court will reduce a claim for fees to account for limited success by the prevailing party. 461 U.S. at 436. At the same time, the Court is mindful of the fact that in cases involving numerous plaintiffs with similar claims, some of whom (or which) are successful and some of whom (or which) are not, segregating the time spent pursuing the successful claims from the unsuccessful ones can be difficult. In some instances, research into a particular legal issue affecting several of the parties – *e.g.* the law involving proof of a perceived disability, relating to both Clawson's successful claim and Dillon's unsuccessful claim – would likely have have been performed even if the case been brought solely on behalf of Clawson from its inception. Thus, generalized reductions of 50% or 75% to account for dismissal

---

[10]The Plaintiff claims that all billing entries relating solely to the Former Plaintiffs were excised from the fee request. That excision appears to have been accomplished by simply omitting time entries that reference any of the Former Plaintiffs by name. For the reasons stated herein, this is insufficient to adequately omit time spent on claims asserted exclusively y the Former Plaintiffs, and not Clawson.

of half or three-quarters of the parties in existence when the time was billed is an inaccurate method of eliminating time spent needlessly on unsuccessful claims by dismissed parties.

At the same time, the Court finds the token 5% reduction proposed by Clawson's expert to be insufficient. Although some of the legal research and factual analysis performed on behalf of all four original plaintiffs – or even on behalf of Clawson and Dillon in proceeding to trial – would have inevitably been performed anyway solely on behalf of Clawson, the case also involved substantial legal and factual issues that were unique to the Former Plaintiffs. For example, legal research as to the nature and extent of damages available for an ADA claim might have been incurred regardless of whether Clawson was the sole complainant, or only one of four. However, development of the facts relating to each individual's claim for damages, and legal issues that were raised by those facts (*e.g.* whether the specific actions taken by the individual could be sufficient to mitigate damages), require individualized analysis that would have little or no applicability to the claim by the Plaintiff. Similarly, each individual had unique interactions with the Defendants' officials, warranting individualized factual and legal analysis of the significance of these interactions. Dispositive motions might involve some generalized, unified legal analysis applicable to multiple plaintiffs' claims – *i.e.* the elements of an ADA claim; whether there is a duty to accommodate a perceived disability – but also require individualized analysis and discussion of the particular facts each plaintiff can establish with regard to his own claims. Moreover, although Clawson may be correct that all of the Former Plaintiffs would have been deposed as percipient witnesses in support of his claim, the depositions and discovery conducted regarding the Former Plaintiffs would have been far less comprehensive in such a circumstance.

In attempting to determine the appropriate reduction to make to account for time spent on factual and legal issues that were exclusive to the Former Plaintiffs, the Court again looks to the legal and factual overlap between the successful claims by Clawson and the unsuccessful claims by the Former Plaintiffs.[11]  Turning first to overlapping issues of law, the Court notes that in the Sixth Amended Complaint **(# 68)**, the final iteration of the plaintiffs' claims, all four of the original plaintiffs asserted ADA claims for failure to accommodate and for discrimination on the basis of perceived disability, for ADA retaliation, and for state-law claims for wrongful discharge in violation of public policy (*i.e.* retaliation for the plaintiffs' filing worker's compensation claims), promissory estoppel, and breach of implied contract (both arising from the Defendants' failure to comply with their own stated employment policies).  In addition, Bartlett asserted additional ADA claims premised upon him having an actual disability and for having a record of an actual disability.  The only claim upon which Plaintiff Clawson prevailed was a claim of failure to accommodate a perceived disability.  From the perspective of legal research and analysis, all of the research done in support of all four of the original plaintiffs' claims of failure to accommodate a perceived disability might be entirely compensable to Clawson,[12] but research done to support Bartlett's claims of an actual disability or a record of a disability was irrelevant to Clawson's

_____

[11]Within the concept of "unsuccessful claims by Former Plaintiffs," the Court includes those claims alleged by Clawson that were dismissed prior to trial.

[12]The Court notes that, in some ways, research that is relevant to the claims of multiple claimants is likely to require less time and effort than research directed at a particular claimant's unique situation.  Questions that are common to all of the original plaintiffs are likely to be more general questions of law that are easily answered with minimal research.  As the factual positions of the plaintiffs diverge and become more individualized, the number of discrete legal issues that require analysis multiply, and the time required to resolve all of those issues increases geometrically.

successful claim, as would be any research done to support the ADA retaliation and state-law public policy claims of all four plaintiffs. Contrary to Clawson's argument, these are not simply "alternative theories" premised on "a common core of facts." *Praseuth*, 406 F.3d at 1258. As stated above, a claim for retaliation involves very different legal and factual issues than does a claim for discrimination or failure to accommodate; likewise, a claim that an individual is <u>actually</u> disabled involves a very different analysis than a claim that one is <u>regarded as</u> disabled. The law governing the common-law tort claims has no similarity to the law governing ADA failure to accommodate claims. Thus, from a legal research perspective, there was both substantial overlap and substantial differences between Clawson's successful claim and the various unsuccessful claims by the Former Plaintiffs.

The extent of overlap on issues of law likely increased following the Court's summary judgment ruling. At that point, the only plaintiffs remaining were Clawson and Dillon, and the only claims remaining were both individuals' failure to accommodate claim based on perceived disability, plus an independent claim by Dillon for disability discrimination, arising from essentially the same set of facts. From the standpoint of legal research and analysis, these claims were quite similar, and there is less justification for a reduction based on unsuccessful claims after this point.

As to development of issues of fact, again, the Court finds both substantial overlap and substantial differences among the various plaintiffs. All of the original plaintiffs' claims did involve several common factual issues – *e.g.* the content and application of the Defendants' policies, the nature of the various tasks performed at the mine, and the integration of the Defendants' enterprises. At the same time, each plaintiff had discrete injuries and medical restrictions, each had different interactions with the Defendants' officials, and each had different

issues relating to damages. Some reduction of the overall hours claimed by Clawson is necessary to account for time spent developing a factual record regarding the claims by the Former Plaintiffs, insofar as some of that factual record was irrelevant to the successful claim presented by Clawson.

Taking all of these factors into account, the Court concludes that a generalized percentage reduction would be sufficient to account for legal research and analysis devoted to the unsuccessful claims by the Former Plaintiffs. As to issues of law, the Court finds that issues relating to Clawson's successful claim account for 60% of the total time spent by the plaintiffs' counsel on legal research and analysis throughout this case. The Court reaches this figure by observing that, from a legal perspective, the amount of research and analysis required to develop Clawson's successful failure to accommodate claim might be said to balance equally against the legal work necessary to develop the variety of unsuccessful claims premised on Bartlett's actual disability, and all of the original plaintiffs' claims of retaliation and state-law claims. Although outnumbered by the unsuccessful claims, the failure to accommodate claim on which Clawson prevailed can reasonably be said to have been the primary focus of the litigation, and thus, likely to receive as much, if not more, legal research and analysis than the other claims combined. Moreover, the Court notes that, unlike the unsuccessful claims that essentially vanished from the case after summary judgment, the successful claim required additional research and refinement through the end of trial and into post-verdict motions. Thus, it might be appropriate to assume that 60% or more of the overall time spent by Clawson's counsel on legal research and analysis should be deemed to relate to the successful claims.

As to time spent on factual development, the Court finds that the common issues of fact significantly outweigh the individualized differences. Factual issues such as integration of operations, the Defendants' policies and the manner in which they were applied, and the nature of the various job assignments at the mine are common, to one extent or another, to both the successful and unsuccessful claims, and evidence on these points occupied the vast majority of the trial testimony. It might be fair to estimate that 80% of the time spent developing a factual record in the entire case would have been necessary to support Clawson's own claim, even if no other claims had been brought.

Finally, the Court observes that, with regard to the amount of time spent by the parties, factual issues significantly predominated over legal issues, suggesting that any reduction for unsuccessful claims should skew closer the 80% figure than the 60% one. Moreover, the Court notes that the bulk of the unnecessary time would have been spent prior to the Court's summary judgment ruling; put differently, the vast majority of counsel's time spent on preparing for and presenting the case at trial should be compensable, as Dillon's claims at trial varied only slightly in fact and law from Clawson's. However, given the wealth of billing entries at issue in this case, and the lack of periodic summaries that would allow the Court to easily apply reductions to pre- and post-summary judgment billing totals, the Court can only make proportional reductions to the total fee request as a whole. To ensure that such a wholesale reduction does not unnecessarily cut into the mostly compensable post-summary judgment hours, the Court will move even further towards the assumption that 80% of the time spent developing the case was necessary to present the successful claim. Thus, the Court concludes that 75% of the total time spent by Clawson's counsel throughout this case would have been expended had his successful claim been the only

claim pursued, and thus, a simple 25% across-the-board reduction in the number of hours claimed will adequately eliminate time spent developing and presenting the unsuccessful claims.

E. Excessiveness/vagueness

Finally, the Defendants object generally to the excessiveness of the number of hours claimed by Clawson, and to the vagueness of many of the billing entries. For example, they point to numerous, allegedly unnecessary, office conferences among counsel; vagueness in designating the substance of these conferences; and excessive time spent on matters such as a Fed. R. Evid. 702 hearing regarding Brennan, which required several days to complete (**# 310, 374, 376**) due to the inability of counsel to concisely address the relevant issues. Clawson contends that all of this time was reasonable and necessary, and that the billing entries adequately describe the services performed.

The Court agrees with the Defendants, for many of the reasons stated above, that the time claimed by Clawson is excessive in general. The Court finds that an inordinate amount of time in all of the various billing entities' records are devoted to repetitive intra-office conferences. Among the particularly objectionable billing entries of this type are entries that reflect that the timekeeper spent most of his or her time attending conferences, rather than engaging in substantive work, *see e.g. Docket* # 464, Ex. 3, entries 2685-2835 (11 out of 12 consecutive time entries primarily involve participation in office conferences); entries reflecting numerous conferences covering the same issues, often with little indication of substantive work being performed in the interim, *see e.g.* Ex. 5, entry #5957 (12/14/05 "meet with KKillian regarding jury instructions"); #5960 (12/15/05 "meet with KKillian on revising jury instructions"); # 5962 (12/16/05 "meet with KKillian on jury instructions"); # 5973 (12/21/05 "meet on jury instructions

with KKillian"); # 5976 (12/27/05 "meet on jury instructions with KKillian"); # 5978 (12/27/05

"meet on jury instructions"); # 5989 (12/28/05 "meet on just instructions with KKillian"); #5995

(12/29/05 "discuss jury instructions with KKillian"); conferences that seem to have occurred

simply to effect the assignment of a task or to report its status or completion, *see e.g.* Ex. 22,

entry # 1106 ("office conference with JKKillian to review second set of discovery requests; revise

same per JKKillian; followup office conference with JKKillian . . ."); and conferences that appear

to have occurred simply to relate the events of a conference to others who not initially involved,

*see e.g.* Ex. 22, entry #1237 ("office conference with DDavis regarding additional documents . . .;

office conference with JCJensen regarding same"). Although the Court commends efforts by

Clawson's lead counsel to delegate as much work as possible to less-expensive billing entities,

efficiency is not obtained when such delegation requires numerous conferences involving multiple

individuals to assign the task, discuss its progress, and receive its results.[13]  For example, meetings

that are conducted simply to assign a task, or to ensure that a task is progressing as requested, do

little to advance the substance of the litigation and should not give rise to a fee award.  *See e.g.*

*Docket* # 464, Ex. 2, entry # 3736 ("Staff conference task assignments and status of tasks; letter

to client"); # 4203 ("Meeting w/KStahl & Ddavis assignment of tasks"); # 5369 ("Meeting

w/DDavis, KStahl & A Yeretsky regarding staff assignments"); Ex. 5, entry # 6598 ("discussion

regarding tasks and progress with CRichter"); entry # 6055 ("discuss task list with KKillian");

entry # 6104 ("meeting on task list"); *Docket* # 464, Ex. 6, entry #6951 ("meeting on Clawson –

---

[13]Indeed, it should be kept in mind that intra-office meetings involve multiple billing entities, each of whom bills his or her time in attending the meeting.  A 1-hour meeting might yield 2, 3, or even more hours of time being billed for a single event.  Such multiplication of expense requires particular diligence in ensuring that conferences are conducted and billed only to the extent absolutely necessary.

tasks/letters/timelines"); entry # 7016 ("meeting to discuss timelines, tasks, earnings summaries");

# 7066 ("discuss tasks with JKK/D.D."); Ex. 22, entry # 1141 ("office conference with JKKillian

regarding tasks following his telephone conference with opposing counsel"); #1210 ("office

conference with JKKillian regarding assignment of Motion to Compel (DDavis)"); # 1274 ("office

conference with JKKillian to schedule meeting to review deposition tasks").

The Court also agrees with the Defendants that lack of adequate preparation on the part of

Clawson's counsel resulted in needless expenditures of time.  It took three separate hearings to

finally resolve Rule 702 objections to Brennan, largely because Clawson's counsel was unable to

comply with the Court's procedures for such hearings.  In addition, although the Defendants do

not specifically address it,[14] the Court's own observations are that a the parties' failure to be fully

prepared for trial at the time of the Final Trial Preparation Conference required the Court to twice

continue that hearing as well (**# 335, 344, 378**).  The Court also notes that large amounts of time

were wasted at trial as a result of the parties' inability to stipulate to undisputed facts, and through

the presentation of redundant and cumulative evidence.  Although the Court does not hold

defense counsel blameless for its role in causing some of these inefficiencies, it finds that some

reduction in the amount of hours claimed by Clawson is necessary to account for the Clawson's

counsel's own failures of preparation.

Based on the Court's review of the entirety of the record, and its own observations of the

performance of counsel throughout this action, the Court finds that the amount of fees sought by

Clawson is excessive and requires reduction.  Because it is impossible to adequately excise all of

---

[14]The Court is not prevented from addressing impermissible time entries that have not
been specifically challenged by the opposing party. *Robinson*, 160 F.3d at 1286.

the numerous billing entries that could be considered excessive, the Court finds that a simple proportional reduction is warranted. In light of the totality of the evidence, the Court finds that a reduction of the total amount of fees requested by 15% is sufficient eliminate those excessive, unnecessary, and vague billings that remain after the other reductions discussed above are made.

### 4. Conclusion regarding fees

The Court has considered the remaining arguments raised by the Defendants, and, to the extent not implicitly addressed herein, those arguments are rejected.

To calculate the lodestar, the Court begins with Clawson's fee request, as adjusted, in his reply brief. That request was for $746,352.97 in attorney and paralegal fees. From that amount, the Court makes the following reductions:

| | |
|---|---|
| • starting request: | $746,352.97 |
| • less paralegal clerical time[15] | $ 13,019.36 |
| • less unsuccessful motions | $ 14,733.67 |
| • less time re: trial consultant | $  6,747.15 |
| | |
| • subtotal | $711,852.79 |
| • less 25% re: former plaintiffs | $177,963.19 |
| | |
| • subtotal | $ 533,889.60 |
| • less 15% re: excessiveness | $  80,083.44 |
| | |
| • total | $453,806.16 |

---

[15]The Plaintiff initially requested $99,689.34 in paralegal fees. Concessions in his reply brief reduced this amount to $97,496.59. From the discussion above, the Court has concluded that the Plaintiff is entitled to $84,477.23 for paralegal services. Subtracting $84,477.23 from $97,496.59 requires the Court to reduce the Plaintiff's claim for fees by $13,019.36 to account for paralegal clerical time.

The Court finds that the lodestar figure of $453,806.16 reflects a reasonable attorney's fee, based on the foregoing discussion and the totality of the record.[16]  Neither party has argued for a modification of the lodestar figure, and thus, the Court grants Clawson's motion for attorney's fees in the amount of $453,806.16.

### 5. Costs and expenses

Finally, the Plaintiff seeks reimbursement of various expenses pursuant to 42 U.S.C. § 1988, and review of certain costs denied by the Clerk pursuant to 28 U.S.C. § 1920.

Clawson requests a total of $40,634.34 in costs after conceding certain challenges by the Defendants.  The Court will review only those items that remain in contention.  First, the Defendant challenges two claims for travel expenses, one for $159, and one for $250, relating to travel to one of the Final Pretrial Conferences.  Clawson explains in reply that the fees are represent airfare and milage, respectively, for the two counsel who traveled from Grand Junction to attend the conference.  In light of the Defendants' concession of the other claims for travel expenses in similar amounts, and because the Court cannot say that it was unreasonable for either side to bring two counsel to attend the conference, this expense is allowed.

The Defendants challenge several claims for expert witness expenses.  As to Jerome Darnell, Clawson requests $800 for Darnell's expert testimony as to all four of the original plaintiffs' damages.  The Defendants argue that this figure should be reduced by 75%, based solely on the number of parties involved.  Clawson contends that a reduction of no more than 25% is appropriate.  Because damages present highly individualized factual issues, the Court finds

---

[16]Although the Court has given little consideration to the parties' respective experts' opinions as to the general reasonableness of fees in a case such as this, the Court observes that the figure it has independently derived falls, entirely coincidentally, quite neatly between them.

that a substantial reduction of Darnell's fees is appropriate to exclude time spent on opinions related to the Former Plaintiffs. However, a strict four-way division of those fees fails to account for testimony that would have been taken from Darnell regarding his qualifications and methodology, even if Darnell was only opining with regard to Clawson. Under these circumstances, the Court finds it appropriate to reduce this claim by 60%, or $480.

The Defendants challenge $713 claimed by Clawson for opinions obtained from Rehabilitation Consultant Patrick Renfro. The Defendants contend that because Renfro did not testify, and that some of his services were duplicated by Brennan's vocational assessment, this expense should be excluded in its entirety. Clawson contends that the need for Renfro's services was evident early in the case at the time his services were secured, even if subsequent sharpening of the issues rendered his services irrelevant, and thus, his expense should be compensable. *Citing Ramos*, 713 F.2d at 558 (requiring the Court to assess claims for fees and expenses mindful of how the necessity for those services appeared at the time they were secured). Because the record does not obtain any report by Renfro demonstrating the nature of the opinions he was retained to offer, the Court cannot find that Clawson has carried his burden of showing that Renfro's services differed significantly from the vocational rehabilitation testimony obtained from Brennan, such that opinions from both individuals appeared to be necessary. Accordingly, the Court rejects the entire $713 claimed for this expense.

The Defendants challenge the request for $981 claimed for the expense of deposing Patricia Anctil, the Defendants' vocational rehabilitation expert and the equivalent of Darnell. The arguments raised by the parties are the same as those raised with regard to Darnell, and the

Court's analysis is the same. The claim for $981 in expenses by Anctil is reduced by 60%, or $588.60.

The Defendants contest the $7,487.50 claimed by Clawson for the services of Donald Vogenthaler, an economist who testified at the Rule 702 hearing in support of Brennan's opinions. The Defendants contend that Vogenthaler's charges should be reduced by 50% to account for the continuances of that hearing that required Vogenthaler to return and incur an additional day of charges. Clawson contends that the Defendants' aggressive challenge to Brennan warranted Vogenthaler's return. The Court agrees that the Rule 702 hearing could have been completed in a single day had Clawson's counsel been adequately prepared, and thus excludes those expenses charged by Vogenthaler for attending the remaining days of the hearing. The excluded expenses total $3,550.

The Defendants challenge $5,148.78 in expenses billed by Brennan on the same grounds as Vogenthaler. For the reasons stated above, the Court excludes those expenses billed by Brennan on the subsequent days of the Rule 702 hearing. The excluded expenses total $1,072.60.

Clawson requests $6,540.04 in photocopy fees. The Defendants oppose a request in excess of $4,766.11, which they contend is the more accurate computation according to Clawson's counsel's own billing records. The Court finds that Clawson's counsel's methodology for accounting for copy costs internally – 25% of all copy costs through the date of summary judgment, 50% thereafter – more accurately reflects the distribution of costs than Clawson's request, which seeks a flat 50% of all copy costs throughout the case. In most cases, copying costs are highest during the discovery phase of the case – a time when copies were being made for

four separate claimants – rather than during the trial phase. Accordingly, the Court reduces Clawson's claim for copying costs by $1,773.93.

For the same reasons, the Court reduces Clawson's claim for postage costs from $721.37 to $350.32, a reduction of $371.05.

The Defendant raises similar objections to Clawson's request for $3,266.03 in LEXIS charges, arguing that this represents 100% of the LEXIS charges incurred on behalf of all of the original plaintiffs in this case, and that Clawson's counsel's own internal accounting only apportions $1,211.99 as Clawson's share of this expense. Clawson contends that he benefitted from all of this research, and thus, should recover all of it. For the reasons discussed above with regard to the apportionment of time spent on legal research among the successful and unsuccessful claims, the Court finds that an award of 60% of the total LEXIS charges appropriately reflects the time spent only on the successful claims by Clawson, and thus reduces the claim for LEXIS charges by $1,306.41.

The Defendants challenge the $1,392.94 requested by Clawson for telephone charges. The Defendants contend that Clawson's internal billing apportions $475.80 to Clawson himself, and that that amount is appropriate. Clawson argues that most telephone calls were made between counsel, and that telephone calls exclusively attributable to conversations involving only claims by or with the Former Plaintiffs would be *de minimis*. The Court finds Clawson's argument to be more persuasive, and reduces the claim for telephone charges by a token 5%, or $69.64.

Finally, the Defendants challenge several Federal Express expenses claimed by Clawson. Clawson requests $598.28. The Defendants concede that $358.74 in such charges is acceptable,

but object to the remaining claims. For the reasons discussed above regarding Renfro, the charge involving shipping items to him is disallowed. The Court also disallows Clawson's claims for shipping records to one of its associates, working from her home in Texas. The Court finds that such telecommuting arrangements exist to benefit the employee and employer involved, but that absent extraordinary circumstances, it is not reasonably or appropriate to charge clients (or, here, the Defendants) for the expenses incurred internally for maintaining that relationship. Based on the entries denoted "PR" and "BT" in Defendants' Exhibit XX, the Court calculates these charges as $197.90, and that amount is excluded.

Accordingly, the Court awards expenses to Clawson in the amount of $40,634.34, less $4,850 (trial consultant fees), less $480 (Darnell), less $713 (Renfro), less $588.60 (Anctil), less $3,550 (Vogenthaler), less $1,072.60 (Brennan), less $1,773.93 (photocopies), less $371.05 (postage), less $1,306.41 (LEXIS), less $69.64 (phone), less $197.70 (Federal Express), for a total of allowed expenses of $25,661.41.

Clawson also challenges items that the Clerk of the Court refused to tax as costs under 28 U.S.C. § 1920. He seeks a total of $3,337.19 in costs that the Clerk refused to tax. The Defendants object to items totaling $2,638.65.

Clawson requests $577.05 in costs for obtaining the deposition transcript of Anctil and $512.10 for the transcript of Darnell for use at trial. The Defendants argue that these amounts should be reduced by 75%, to reflect that these depositions involved all four original plaintiffs. There is no dispute that Clawson would have had to purchase these transcripts even if the case had only been brought on his behalf since its inception. The only difference would be that the transcripts might be somewhat shorter, and thus, less expensive, if these experts had not had to

opine with regard to the Former Plaintiffs. The Court has previously reduced expenses relating to these experts by 60%, and it does so again, for the same reasons, with regard to this request. Thus, Clawson's request for costs is reduced by 60% of $577.05 and $512.10, or a total reduction of $653.49.

Next, Clawson seeks $218.29 in costs for obtaining the transcript of the Rule 702 hearing. The Defendants contend that the cost of that transcript was magnified by Clawson's counsel's lack of preparation for the hearing. The Court agrees that some reduction is necessary to eliminate the cost of transcribing unnecessary colloquy, and finds that a reduction of 20% is suitable to achieve that purpose. This item is reduced by $43.65.

The Defendants object to Clawson's request for $685.70 claimed by the Plaintiff as the cost of copying trial exhibits, arguing that only 141 of the 600 exhibits brought to trial were actually used. Clawson concedes that this figure is inflated, but argues that some of the blame for that falls upon the Defendants for demanding the inclusion of certain exhibits. Clawson suggests that a 30% reduction in his own request might be appropriate for his role in designating unneeded exhibits. The Court finds that both sides are responsible for failing to exercise reasonable professional judgment in selecting the exhibits needed for trial and in failing to timely stipulate to undisputed facts, and finds that the costs of the preparing unused exhibits should be shared equally. Thus, the Court reduces Clawson's claim for this item by $342.85.

The Defendants object to $107 claimed by Clawson for two courrier deliveries of filings to the Court. Because the Court has long encouraged parties to use technology such as e-mail to avoid the need for expenses such as this, the Court sees no reason to tax this item. Clawson's request will be reduced by $107.

Accordingly, of the $3,337.19 sought by the Plaintiff as additional costs, the Court finds that $1,146.99 ($653.49 in Anctil and Darnell deposition transcripts; $43.65 for Rule 702 hearing transcripts; $342.85 in copying expenses; and $107 in courier fees) should be taxed as additional costs.

### C. Bartlett and Richards' request to review taxation of costs

Separately, the prevailing Defendants sought taxation of costs against Former Plaintiffs Bartlett and Richards. The Clerk of the Court taxed $1,286.84 in costs against Richards **(# 467)**, and $2,852.94 in costs against Bartlett **(# 468)**. Bartlett and Richards argue that the Defendants' Bill of Costs with regard to them was untimely under D.C. Colo. L. Civ. R. 54.1, because it was not filed within 10 days of the Court's March 15, 2005 Order granting summary judgment against them. They contend that this Order, rather than the Court's entry of final judgment on March 28, 2007 **(# 457)**, constitutes the triggering event for the filing of a Bill of Costs.

This argument is unavailing. Local Rule 54.1 provides "a bill of costs must be filed . . . within ten days after entry of the judgment or final order." In the absence of certification pursuant to Fed. R. Civ. P. 54(b), the Court's order granting summary judgment against Bartlett and Richards "is subject to revision at any time before the entry of judgment." Fed. R. Civ. P. 54(b). In other words, it is not final, and thus, cannot be a "final order" for purposes of Local Rule 54.1. Nor is it a "judgment" for purposes of the Local Rule, because under Fed. R. Civ. P. 58(a), it was not set forth on a separate paper. Thus, the time for filing a Bill of Costs under Local Rule 54.1 did not begin running upon entry of the summary judgment order in 2005. In the absence of any other entry of judgment against the Former Plaintiffs, the interlocutory summary judgment ruling

became final only with upon entry of the final judgment in this action in 2007.[17]  *See e.g.*

*Montgomery v. City of Ardmore*, 365 F.3d 926, 934 (10th Cir. 2004) (partial summary judgment

order merged into final judgment).  Thus, the Defendants' filing of a Bill of Costs within 10 days

of the entry of final judgment in 2007 was timely.

Moreover, the fact that the Court did not expressly direct that the Defendants could

recover costs in the 2005 Order would render any Bill of Costs filed by the Defendants at that

time premature under Local Rule 54.1, which requires the Court to expressly address a party's

entitlement to costs in the judgment or final order.  Because the Court only makes such a notation

in the Amended Judgment issued simultaneously with this Order, Bartlett and Richards can

demonstrate no prejudice that resulted from the Defendants' premature, not stale, Bill of Costs.

Accordingly, Bartlett and Richards' motion to review the taxation of costs against them is

denied.

## CONCLUSION

For the foregoing reasons, the Defendants' Motion for New Trial **(# 459)** is **DENIED**.

The Plaintiff's Motion for Attorney's Fees **(# 464)** is **GRANTED IN PART**, insofar as the Court

---

[17]The Court concedes that issues regarding the finality of interlocutory orders disposing of claims and parties have been the subject of much confusion.  This Court has itself been somewhat inconsistent in its practices regarding entry of separate judgments under Fed. R. Civ. P. 58 when a case has been disposed of on procedural grounds, or where some but not all claims have been disposed of via summary judgment.  Indeed, the Court notes that its final judgment entered in this case made no mention of Former Plaintiffs Bartlett and Richards.

To ensure compliance with this Rule 58, particularly in light of *Warren v. American Bankers Ins. of FL*, ___ F.3d ___, 2007 WL 3151884 (10th Cir. Oct. 30, 2007) (requirement of separate judgment is to be "mechanically applied," regardless of the nature or form of the order disposing of claims), the Court will amend its judgment to properly dispose of the claims by Former Plaintiffs Bartlett and Richards.  However, for the reasons discussed in the body of this Order, even in the absence of an Amended Judgment, the Former Plaintiffs' challenge to the timeliness of the Defendants' Bill of Costs is without merit.

finds that the Plaintiff is entitled an award of fees in the amount of $453,806.16, and expenses in the amount of $25,661.41, and **DENIED IN PART**, to the extent the Plaintiff seeks a recovery in excess of these amounts. The Plaintiff's Motion to Review Taxation of Costs **(# 477)** is **GRANTED IN PART**, insofar as the Court taxes an additional $1,146.99 in costs in favor of the Plaintiff, and **DENIED IN PART**, to the extent the Plaintiff seeks costs in excess of that amount. Former Plaintiffs John Bartlett and Thomas Richards' Motion to Review Taxation of Costs **(# 478)** is **DENIED**. The Plaintiff's Motion to Supplement **(# 482)** his Motion for Attorney's Fees is **GRANTED**, and the Court's ruling herein addresses those matters raised in the Plaintiff's supplement.

Dated this 28th day of November, 2007

BY THE COURT:

Marcia S. Krieger
United States District Judge